643 A.2d 468

David L. ALSTON

v.

STATE of Maryland.

No. 717, Sept. Term, 1993.

Court of Special Appeals of Maryland.

June 29, 1994.

Certiorari Granted Nov. 16, 1994.

Victoria S. Lansburgh, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued Before WILNER, C.J., MOYLAN, J., and GETTY, Judge (retired) Specially Assigned.

MOYLAN, Judge.

█ The subject is depraved-heart murder. The "bottom line" is that when a group, or two groups, of hoodlums deliberately engage in a gang-war style of shoot-out in a crowded urban area, they collectively trigger an escalating chain reaction creating a high risk to human life. When instead of taking their gunslinging vendetta to an uninhabited island or some remote spot in the desert, they arrogantly indulge in their homicidal insanity in the middle of a crowded block of residences, each participant in such collective madness displays a wanton and depraved indifference to any human life that might randomly fall within their overlapping and deadly enfilades. Should death to one of the innocent bystanders or homeowners ensue, each participant in the lethal encounter has exhibited the *mens rea* that qualifies him for depraved-heart murder.

In terms of the *actus reus* of this particular depraved-heart murder, the deadly homicidal force was not *a bullet.* Such an analytic approach would commit us to the trivializing foolishness of seeking to establish the trajectory and provenance of each of forty or fifty bullets fired in the course of a single wild exchange. The deadly homicidal force, rather, was a collective hail of bullets, a collective fusillade, with no further parsing required. Which bullet came from which gun is inconsequential. One does not anguish over which member of the firing squad killed the prisoner.

The appellant, David L. "Diesel" Alston, was convicted by a Baltimore City jury, presided over by Judge Roger W. Brown, of 1) the second-degree murder of fifteen-year-old Adrian Edmonds, 2) the reckless endangerment of Adrian Edmonds, 3) an assault on Eric Tyler, the eighteen-month-old baby of

Adrian Edmonds, and 4) the attempted second-degree murder of Gregory Hall. On this appeal, the appellant contends:

    1) that the evidence was not legally sufficient to sustain the conviction for second-degree murder;

    2) that if the conviction for second-degree murder should stand, the appellant's conviction for reckless endangerment should merge into it; and

    3) that Judge Brown erroneously admitted hearsay evidence.

### The Shoot–Out

The shoot-out occurred at 11 P.M. on July 14, 1992 in the 500 block of Presstman Street in West Baltimore. No less than six young women, who were neither members nor adherents of either rival group but who came within the deadly field of fire, testified for the State. Two other witnesses were Renardo Foster, a close friend of one of the contending groups, and Gregory Hall, a participant in the shoot-out and a member of the rival group. Hall testified pursuant to a plea agreement. He had already entered pleas of guilty to the manslaughter of Adrian Edmonds and the battery of Eric Tyler.

Apparently, trouble had been brewing between the two groups of young men over a two-day period. Two nights before the shoot-out of July 14, Renardo Foster had been "shot at by some boys in a red Honda Prelude." Foster believed the shooting stemmed from a dispute about a girl. After the shooting, Foster threw a chair through the window of the girl's home. On the next night, according to the testimony of Gregory Hall, there was another incident involving one Melvin Kirk, as to which no enlightening detail was furnished. All we know is that, as a result of that incident, Gregory Hall decided to arm himself.

In an attempt to establish some chronology of events on the evening of July 14, we look first at the testimony of Phyllis Avery. Ms. Avery, who lived nearby at 556 Roberts Street, was sitting outside her house on the front steps when she

overheard a conversation in the course of which a last-minute effort to achieve a *detente* failed and the shoot-out apparently became inevitable.

The rival group to the one that the appellant belonged to numbered at least three adherents: Gregory Hall, a second individual known only as "B.O.," and a third individual known only as "D Nice." "B.O." was described by one of the witnesses as "one of the New York boys." The appellant, incidentally, was known in the neighborhood by his nickname of "Diesel."

As Phyllis Avery sat on her steps, she saw "D Nice" come up the street, calling "Diesel's" name. Two of his companions waited for him at the corner, one of whom was "B.O." It was the appellant's brother Alton Alston who responded, on behalf of the appellant, to the hail from "D Nice." He explained that he was "Diesel's" brother and that he was authorized to speak for him. The effort to effect a truce was then made as "D Nice" directed Alton Alston to "tell your brother we would like to squash this before anyone else gets hurt." Alton Alston's response was apparently less than conciliatory, for "D Nice" then stated with prophetic accuracy, "Well, I guess this means more people getting hurt." The two negotiators then walked away in opposite directions. It was approximately twenty minutes after that conversation that Phyllis Avery heard the gunshots.

Before returning to the second phase of Phyllis Avery's observations, a chronological narration would interrupt her testimony to look at the intervening observations of Addie Smith, who lived at 1911 Brunt Street, near the scene of the ultimate shooting. Brunt Street is a narrow, alley-like street apparently connecting the 500 block of Roberts Street, where Phyllis Avery was sitting on her steps, with the 500 block of Presstman Street, where the shoot-out took place. It was she who saw a group of teenagers gathering outside her house who were "acting strange." She recognized one of them as "Junior" Conyers, who also belonged to the same group as did the appellant. One of the group had a bag containing a gun or

guns in it. As the group of young men walked down the alley behind Roberts Street, Addie Smith called the police. As soon as she hung up from that call, she heard "lots and lots of gunshots."

To return to the testimony of Phyllis Avery, approximately fifteen minutes after her observation of the *detente* that failed and shortly before the shooting, she was still on her front steps at 556 Roberts Street when she observed the apparent muster of the forces of the appellant's group. She first saw Rennie "Cooper" Boiseau coming out of Brunt Street, where Addie Smith had made her observations, with a gun in his hand. "Cooper" and another adherent of his party, Micah Mays, sat on the adjacent set of steps. Within minutes, others joined them. Added to the group were Thomas "Porky" Kent, Renardo "Nardo" Foster, and an individual known only as "Rock." Renardo and "Porky" had ridden up on their bicycles, alighted from their bikes, and began checking their guns. It was Renardo who then started passing out bullets from a bag. "Porky" had a medium-sized gun and "Cooper" had what looked like a shotgun. "Rock" and another man got in a car and rode around the corner. "Cooper," "Porky," "Nardo," and Micah then returned to Brunt Street, in the apparent direction of Presstman Street. Phyllis Avery went into her house and, a few minutes later, heard shots.

As soon as she heard gunshots, Phyllis Avery ran outside because she knew her little cousin was in the Brunt Street alley. She pushed her cousin into the house but she herself, at the corner of Roberts and Brunt Streets, was suddenly grabbed by "B.O.," who was "one of the New York boys." "B.O." had a gun in his hand. He threw Phyllis Avery against a wall and told her not to move or he would kill her. At that moment, Alton Alston came around the corner, wrestled "B.O." off of Phyllis Avery, and told Ms. Avery to "run in the house," which she obligingly did.

It was Tracy Braxton who first placed the appellant at the scene. She was sitting on the front steps on the odd-numbered side of Presstman Street just before the shooting broke

out.  With her were the two ultimate shooting victims, Adrian Edmonds and Eric Tyler, along with Takisha Carolina.  Just before the shooting broke out, she saw the appellant coming down the opposite side of Presstman Street.  With him were "Porky," "Cooper," and Micah.  As she was looking, the appellant pulled out a "real big gun" and began shooting with it.  She said that it resembled State's Exhibit No. 7, which was a semi-automatic rifle, recovered by the police two days later.  The appellant and his three companions took a position behind a Chevy Blazer and did their firing from there.  Tracy Braxton and the three companions ran immediately toward Tracy's house, which was about five doors away.  Takisha Carolina got in first.  She was followed by Adrian Edmonds, who was holding her son.  As Adrian Edmonds ran into the hallway, she tossed Eric to Takisha Carolina, saying, "I've been shot."  She collapsed on the floor.  Tracy Braxton then discovered that Eric had been shot as well.

When the police arrived a few minutes later, Adrian Edmonds was already unconscious.  She died from a single gunshot wound in her side.  The eighteen-month-old Eric Tyler had been shot once in the arm.  The two had, incidentally, been hit with bullets of different calibers.

After making it to the sanctuary of her house, Tracy Braxton continued to hear shooting.  When she looked out shortly thereafter, she saw the appellant running away.  Takisha Carolina testified to the same effect as Tracy Braxton had done.  She testified that it was the appellant, "Cooper," and two "light-skins" who came down the street, hid behind the truck, and started shooting.  The "light-skins" were apparently "Porky" and Micah.

Corinthia Carolina and Charlene Braxton could each testify only about the general magnitude of the shoot-out.  Corinthia Carolina heard "a lot of shots" fired and saw "the sparks from the bullets shooting."  Charlene Braxton observed at least two men shooting long guns "lying on a Bronco truck" and people behind the truck "jumping up and down" and shooting across the top of it.

When the police surveyed the scene later, cartridge cases were all over the area and the Chevy Blazer was riddled with bullets. Two other vehicles on the same side of the street as the Blazer also suffered bullet damage. Some of the casings recovered indicated that an automatic or semi-automatic weapon had been involved.

Two days after the shoot-out, the police executed a search warrant at the residence of Amy Conyers, the sister of Thomas "Junior" Conyers. They arrested the appellant, Thomas "Junior" Conyers, Micah Mays, Rennie "Cooper" Boiseau, and Thomas "Porky" Kent. Recovered from the home was a .45 caliber Tech Nine semi-automatic handgun and a .722 caliber semi-automatic rifle.

The testimony of Gregory Hall gave us a view of what the other "gang" was doing. Hall stated that he knew that the appellant and the appellant's friends were angry at "B.O." Hall himself did not know what to expect because he "was friends of . . . the other guys," *i.e.*, "B.O." and "D Nice." As a result, Hall armed himself with a .32 revolver on the night of the shoot-out. He explained further that "D Nice" was armed with a small handgun and that "B.O." was armed with a 9 mm. "M–11, something like that."

With apparent reference to the peace negotiations that failed, Hall described how "D Nice" had walked up Roberts Street, had spoken to someone, and then had returned. Shortly after that, Hall, "B.O.," and "D Nice" started walking up Division Street in the direction of Presstman. Hall continued:

> We was walking up Division Street and as I stepped on the block of Presstman, shooting just started, so I ran back and ducked behind a car and that's when B.O. and Nice, they ran up and started shooting and I ran across the middle of Division going down Presstman discharging my firearms.

The general flavor of what happens, and what happened here, when a group of arrogant and swaggering young men, acting like a group of drunken cowboys, engage in a street

shoot-out, was well described by Gregory Hall. Hall fired his own gun six times, not aiming at anything in particular. He described how "B.O." and "D Nice" stood in the middle of Presstman Street, firing their guns "everywhere." When asked if he could initially see who he was shooting at, he stated that he could not. He described how later in the firefight, he observed the appellant firing at him. The most telling comment, about behavior like this generally, was Hall's description of "D Nice" when the shooting was over. He described "D Nice," as "hyper and pumped up." He stated that "D Nice" stood on the corner "yelling, hopping around like he just had done something that was outstanding."

It but remains to describe the crime that all of these gunmen perpetrated as they set this deadly chain of events in motion.

### Depraved–Heart Murder

The appellant raises the issue of legal insufficiency only with respect to his conviction for the murder in the second degree of Adrian Edmonds. Murder, of course, requires that there be a homicide. Adrian Edmonds was indisputably the homicide victim. Murder further requires that the criminal agent perpetrate the homicide with malice. We now recognize that there are at least four forms of murderous malice. One of these requires neither a specific intent to kill nor a specific intent to do any grievous bodily harm. Neither does it involve the perpetration or attempted perpetration of a felony. This type of murder, which does not have an aggravated first-degree form, is referred to as "depraved-heart" murder. The particular murderous *mens rea* that supports it was described in *DeBettencourt v. State,* 48 Md.App. 522, 530, 428 A.2d 479, *cert. denied,* 290 Md. 713 (1981):

> In homicide law, [the] classic form of malice is referred to as "express malice." In its vaster experience with infinite nuances, however, the law of homicide has recognized variant forms of malice. It refers to these as the various types of "implied malice" (more sophisticated modern analysis recognizes them as forms of "equivalent malice"). One of

these variant forms of malice—the analogue of the hour—is that of "the depraved heart." It is the form that establishes that *the wilful doing of a dangerous and reckless act with wanton indifference to the consequences and perils involved,* is just as blameworthy, and just as worthy of punishment, when the harmful result ensues, as is the express intent to kill itself. This highly blameworthy state of mind is not one of mere negligence (even enough to serve as the predicate for civil tort liability). It is not merely one even of gross criminal negligence (even enough to serve as the predicate for guilt of manslaughter). *It involves rather the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not.* The common law treats such a state of mind as just as blameworthy, just as antisocial and, therefore, just as truly murderous as the specific intents to kill and to harm. (emphasis supplied).

That definition of depraved-heart murder from *DeBettencourt* was quoted with full approval in *Robinson v. State,* 307 Md. 738, 744–745, 517 A.2d 94 (1986). Judge Adkins went on to describe depraved-heart murder as "one of the 'unintentional murders' . . . that is punishable as murder because another element of blameworthiness fills the place of intent to kill." 307 Md. at 744, 517 A.2d 94. He further explained, "The critical feature of 'depraved heart' murder is that the act in question be committed 'under circumstances manifesting extreme indifference to the value of human life.'" 307 Md. at 745, 517 A.2d 94, quoting 2 *Wharton's Criminal Law* § 143 at 197 (14th ed. 1979). *See also Glenn v. State,* 68 Md.App. 379, 384–387, 511 A.2d 1110 (1986), *cert. denied,* 307 Md. 599, 516 A.2d 569 (1987); *Evans v. State,* 28 Md.App. 640, 695–700, 349 A.2d 300 (1975), *aff'd,* 278 Md. 197, 362 A.2d 629 (1976); *Selby v. State,* 76 Md.App. 201, 209–210, 544 A.2d 14 (1988), *aff'd,* 319 Md. 174, 571 A.2d 1236 (1990); *Cf. State v. Raines,* 326 Md. 582, 599, 606 A.2d 265 (1992).

Rollin M. Perkins & Ronald N. Boyce, 60 *Criminal Law* (3d ed. 1982), describes depraved-heart murder:

The standard has been codified in terms of activity which manifests "extreme indifference to the value of human life" and which creates a grave risk of death," or "where all the circumstances of the killing show an abandoned and malignant heart."

In other words, the intent to do an act in wanton and wilful disregard of the obvious likelihood of causing death or great bodily injury is a malicious intent. The word "wanton" is the key word here.... The difference is that in the act of the shooter there is an element of viciousness—an extreme indifference to the value of human life—that is not found in the act of the motorist. And it is the viciousness which makes the act "wanton" as well as "wilful." (footnotes omitted).

Indeed, in *Simpkins v. State*, 88 Md.App. 607, 596 A.2d 655, (1991), *cert. denied*, 328 Md. 94, 612 A.2d 1316 (1992), Chief Judge Wilner held for this Court that a finding of depraved-heart murder could be based on an act of omission.

In terms of the *actus reus* of depraved-heart murder, the question is whether the defendant engaged in conduct that created a very high risk of death or serious bodily injury to others. 2 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* § 7.4(a) at 200 (1986), describes this necessary *actus reus:*

For murder the degree of risk of death or serious bodily injury must be more than a mere unreasonable risk, more even than a high degree of risk. Perhaps the required danger may be designated a "very high degree" of risk to distinguish it from those lesser degrees of risk which will suffice for other crimes. Such a designation of conduct at all events is more accurately descriptive than that flowery expression found in the old cases and occasionally incorporated into some modern statutes—i.e., conduct "evincing a depraved heart, devoid of social duty, and fatally bent on mischief." Although "very high degree of risk" means something quite substantial, it is still something far less than certainty or substantial certainty. (footnotes omitted).

We have no difficulty in concluding that for approximately ten men to engage in an extended firefight on an urban street in a residential neighborhood was conduct that created a very high degree of risk of death or serious bodily injury to others. What sorts of risks they may have created for themselves and what the criminal liabilities might be with respect to deaths or injuries among or between the competing factions is not our present concern. Our concern is with the risk they posed to the innocent bystanders and residents of the 500 block of Presstman Street. Our conclusion in this regard that a very high risk was created is strengthened by the fact that we are talking about 11 P.M. on a hot July evening, when various persons, according to the evidence, were still sitting out on the front steps of rowhouses, quite aside from any question of whether there were persons moving in the street or on the sidewalks.

The nub of the problem is in identifying the lethal conduct in this case. From the point of view of the endangered neighbors and bystanders there on Presstman Street, from the point of view of the general public outraged at the proliferation of this type of mindless barbarism, and from the point of view ultimately of the criminal law itself, the lethal conduct in this case was the shoot-out itself. We are not going to segment it into forty or fifty discrete life-endangering acts, one per bullet, and then seek to determine which were propelled from the appellant's gun and which from the guns of others. How many discrete life-endangering acts are there, for instance, in a single burst from an automatic weapon? We consider, rather, the collective shoot-out itself to have been a single explosion of bullets, even as we might consider a series of exploding dynamite sticks to be a single explosion. There could have been no "gunfight at the OK Corral" without both the Clantons and the Earps. To pursue the metaphor, we would have to transfer the gunfight from the OK Corral to the schoolyard at recess time to approximate more closely the pagan unconcern with the rights and lives of others exhibited by both the appellant's gang and the "New York boys" on the night of July 14 on Presstman Street. Each of the partici-

pants contributed to the accumulation of critical mass. The critical mass triggered a chain reaction, which then took on a life of its own.

In terms of the *mens rea* of depraved-heart murder, 2 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* § 7.4 at 200–201 (1986), is again instructive:

> The distinctions between an unreasonable risk and a high degree of risk and a very high degree of risk are, of course, matters of degree, and there is no exact boundary line between each category; they shade gradually like a spectrum from one group to another. Some have thus questioned whether this is a sound basis upon which to make the important distinction between murder and manslaughter. More appealing is the Model Penal Code approach, whereunder a reckless killing is murder only if done "under circumstances manifesting extreme indifference to the value of human life." This language, which better serves the "purpose of communicating to jurors in ordinary language the task expected of them," has been substantially followed in many but not all of the modern codes. (footnotes omitted).

In the words of the Model Penal Code, the conduct of the appellant, as well as the conduct of all of the other combatants, was conduct "manifesting extreme indifference to the value of human life." In terms of its unconcern or disregard of the lives of others, it was wanton and it was depraved. We could easily add other adjectives to the lexicon of depravity: inhuman, amoral, animalistic, savage. It was conduct, on the part of everyone involved, that civilized society is simply not going to tolerate.

We hold that the evidence was legally sufficient to support the conviction of the appellant for depraved-heart murder, to wit, murder in the second degree.

### The Inchoate Crime of Reckless Endangerment

The appellant's second contention is that if his conviction for depraved-heart murder should stand, then his convic-

tion for the reckless endangerment of Adrian Edmonds should merge into it. We agree. By engaging in the shoot-out, the appellant contributed to the creation of a substantial risk of death or injury to Adrian Edmonds. He consciously chose to disregard the risk of death or physical harm to others created by the shoot-out. The only significant difference between the inchoate reckless endangerment and the consummated depraved-heart murder is that Adrian Edmonds was hit and killed by one of the flying bullets.

In *Williams v. State,* 100 Md.App. 468, 641 A.2d 990 (1994), we spoke of the inchoate nature of reckless endangerment and of how it might merge into the consummated crime if the harm risked actually came to pass. We observed, 100 Md. App. at 480, 481, 641 A.2d at 995, 996:

> Reckless endangerment is quintessentially an inchoate crime. It is designed to punish potentially harmful conduct even under those fortuitous circumstances where no harm results....
>
> .    .    .    .    .
>
> As with all inchoate crimes, reckless endangerment was intended to plug a gap in the law. Inchoate crimes are designed to inhibit criminal conduct before it goes too far or to punish criminal conduct even when, luckily, it misfires. Reckless endangerment is, indeed, doubly inchoate. At the *actus reus* level, it is one element short of consummated harm. At the *mens rea* level, it is one element short of the specific intent necessary for either an attempt or for one of the aggravated assaults.

Of the specific relationship between reckless endangerment and depraved-heart murder, the *Williams* opinion further commented, 100 Md.App. at 482, 641 A.2d at 996–97:

> As a doubly inchoate crime, reckless endangerment may move one step closer to the actuality of consummated and intended harm in either of two directions. In terms of the *actus reus,* reckless endangerment does not require, of course, that any harm actually be inflicted on a victim. It is enough that a substantial risk or threat of such harm be

created and then consciously disregarded. If one additional element were added to the *actus reus*, however, and actual harm to the endangered victim should come to pass, there are several possibilities for the greater inclusive crime into which the reckless endangerment might then merge.

.    .    .    .    .

If the victim should die as a result of the harm inflicted, that homicide, albeit unintended, might well qualify either as second-degree murder of the depraved-heart variety or as involuntary manslaughter of the gross criminal negligence variety.

On the question of the merger of the reckless endangerment into either form of criminal homicide, the *Williams* opinion was unequivocal, 100 Md.App. at 485, 641 A.2d at 998:

A reckless endangerment resulting in death will constitute either a grossly negligent involuntary manslaughter or a depraved-heart second-degree murder. In either event, the reckless endangerment will merge into the greater inclusive criminal homicide.

### *A Hearsay Objection*

■ The appellant's third contention, that an objection during the testimony of Detective Gary Dunnigan was erroneously overruled, is inconsequential. Detective Dunnigan was routinely describing how he arrived at the scene of the murder and the shoot-out and of how he interviewed a number of people who were at the scene. He indicated that he had interviewed Tracy Braxton, Charlene Braxton, Corinthia Carolina, Takisha Carolina, and an Eric Hampton. When asked if based upon that information he had been able to identify any suspects in the shooting, an objection was made and overruled. Detective Dunnigan indicated that he was able to identify suspects. He subsequently testified, again over objection, that he arrested several persons including the appellant.

Tracy Braxton, Takisha Carolina, and Gregory Hall all unequivocally identified the appellant as one of the participants in the shoot-out that evening. The implied assertion

that some of those same persons identified the appellant to Detective Dunnigan during his initial investigation is so minimally cumulative that the issue is worth no further analysis. It is enough to hold that no prejudicial error occurred.

**SENTENCE FOR RECKLESS ENDANGERMENT VACATED; JUDGMENTS OTHERWISE AFFIRMED; COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND MAYOR AND CITY COUNCIL OF BALTIMORE.**