662 A.2d 247

David L. ALSTON

v.

STATE of Maryland.

No. 105, Sept. Term, 1994.

Court of Appeals of Maryland.

July 25, 1995.

Victoria S. Lansburgh, Asst. Public Defender, (Stephen E. Harris, Public Defender, both on brief), Baltimore, for petitioner.

J. Joseph Curran, Jr., Atty. Gen., (Annabelle L. Lisic, Asst. Atty. Gen., both on brief), Baltimore, for respondent.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Judge (retired) Specially Assigned.

RODOWSKY, Judge.

The petitioner, David L. Alston (Alston), was convicted by a jury in the Circuit Court for Baltimore City of, *inter alia,* second degree murder that had been submitted on the depraved heart theory. The Court of Special Appeals affirmed. *Alston v. State,* 101 Md.App. 47, 643 A.2d 468 (1994). Alston petitioned this Court to review "[w]hether the evidence was insufficient to sustain the charge of second degree murder where the victim was killed by a shot that was fired by a man against whom the petitioner was engaged in a gun battle." We granted the writ of certiorari, and we shall affirm.

Depraved heart murder was described by this Court in *Robinson v. State,* 307 Md. 738, 517 A.2d 94 (1986), as follows:

> " 'A depraved heart murder is often described as a wanton and wilful killing. The term "depraved heart" means something more than conduct amounting to a high or unreasonable risk to human life. The perpetrator must [or reasonably should] realize the risk his behavior has created to the extent that his conduct may be termed wilful. Moreover, the conduct must contain an element of viciousness or contemptuous disregard for the value of human life which conduct characterizes that behavior as wanton.'
>
> "R. Gilbert and C. Moylan, *Maryland Criminal Law: Practice and Procedure* § 1.6–3 (1983). The critical feature of 'depraved heart' murder is that the act in question be committed 'under circumstances manifesting extreme indif-

ference to the value of human life.' 2 *Wharton's Criminal Law* § 143 at 197 (14th ed. 1979). The terms 'recklessness' or 'indifference,' often used to define the crime, do not preclude an act of intentional injury. They refer to 'recklessness' or 'indifference' to the ultimate consequence of the act—death—not to the act that produces that result."

*Robinson,* 307 Md. at 745, 517 A.2d at 98.

The murder victim, Adrian Edmonds, age fifteen, was shot and killed on the night of July 14, 1992.[1] Ms. Edmonds, her eighteen month old baby, and two of her friends happened to be at a street corner in Baltimore City when two bands of teenaged males engaged in a gun battle at about 11:00 p.m. Alston was a member of one of the bands that we shall call the "Alston" group.

In its opening statement, the State conceded that Ms. Edmonds had been killed by a nine millimeter bullet from a weapon fired by a youth known only as "BO." BO was a member of the group at which the Alston group was shooting. BO and another member of this group, "D Nice," were referred to in the neighborhood as "New York boys." Consequently, we shall call the second band of gun battle participants the "New York" group.

In this Court Alston does not contend that the evidence of his conduct is insufficient to convict for depraved heart murder because it lacks the requisite degree of wantonness. Alston's point is that BO is the acknowledged shooter and that his act of shooting is the sole legal cause of Ms. Edmonds's death. Further, Alston argues that as a matter of law no member of the Alston group could have been aiding and abetting BO whose object was to shoot members of the Alston group.

The Court of Special Appeals, speaking through Judge Moylan, rejected these contentions and explained:

---

1. The indictment spells Ms. Edmonds's first name as "Adrian." The autopsy report spells it "Adrienne." We shall use the spelling from the indictment.

"The 'bottom line' is that when a group, or two groups, of hoodlums deliberately engage in a gang-war style of shoot-out in a crowded urban area, they collectively trigger an escalating chain reaction creating a high risk to human life. When instead of taking their gunslinging vendetta to an uninhabited island or some remote spot in the desert, they arrogantly indulge in their homicidal insanity in the middle of a crowded block of residences, each participant in such collective madness displays a wanton and depraved indifference to any human life that might randomly fall within their overlapping and deadly enfilades. Should death to one of the innocent bystanders or homeowners ensue, each participant in the lethal encounter has exhibited the *mens rea* that qualifies him for depraved-heart murder.

"In terms of the *actus reus* of this particular depraved-heart murder, the deadly homicidal force was not *a bullet*. Such an analytic approach would commit us to the trivializing foolishness of seeking to establish the trajectory and provenance of each of forty or fifty bullets fired in the course of a single wild exchange. The deadly homicidal force, rather, was a collective hail of bullets, a collective fusillade, with no further parsing required. Which bullet came from which gun is inconsequential. One does not anguish over which member of the firing squad killed the prisoner."

101 Md.App. at 49, 643 A.2d at 469.

The identity of the participants, a description of the setting, and a statement of the events preceding the gun battle are necessary to understanding the conviction in this case. The two groups of participants, some of whom were not identified by their full names, were comprised of the following persons (parenthetical numerals indicate age as of July 14, 1992):

| The Alston Group | The New York Group |
|---|---|
| David L. "Diesel" Alston (17) | Gregory Alexander Hall (19) |
| Thomas "Junior" Conyers (18) | "D Nice" or "Nice" |
| Micah Mays, known as Micah (17) | "BO" |
| Rennie Cooper Boiseau, known as "Cooper" (17) | |
| Thomas "Porky" Kent (17) | |

Hall and the members of the Alston group were arrested and indicted. BO and D Nice were not apprehended by the time of trial.

The gun battle took place in and near the intersection of Presstman and Division Streets in Baltimore City. Witnesses placed both groups of participants, prior to the gun battle, in the rectangular area formed by Presstman St. on the north, Division St. on the east, Robert St. on the south, and Brunt St. on the west.[2] Within that rectangle there are three alleys. One runs behind the houses on the north side of Robert St. from Brunt to Division (the Southern Alley). A second runs behind the houses on the south side of Presstman St. from Brunt to Division (the Northern Alley). The third alley connects the Northern and Southern Alleys and runs behind the properties that face on Division and Brunt Sts. (the Central Alley).

The neighborhood is densely populated. There are a dozen three-story rowhouses, i.e., houses with party walls, on each side of Presstman St. between Division and Brunt Sts. Those on the south side bear odd numbers beginning at Division St. with 553 and those on the north side bear even numbers beginning at Division St. with 550. The houses on both sides of that block of Presstman St. have no lawns or porches. The building line meets the sidewalk. Basements of the buildings project one-half story above ground level. Access between the front doors and the sidewalk is by traditional Baltimore City "marble" steps.

The night of July 14, 1992 was a hot, humid, Tuesday night. A number of the witnesses described themselves and others sitting on the front steps of various houses before the gun battle. Indeed, the jurors, based on their common experience, could have concluded that in rowhouse neighborhoods in Baltimore City it is not uncommon for residents to sit on the front

---

**2.** Attached to this opinion is a copy of the Baltimore City block plat encompassing the area bounded by Presstman, Division, Robert, and Brunt Streets.

steps or in lawn chairs on the sidewalks on midsummer nights until 11:00 p.m. or later.

Prior to the events hereinafter described, there had not been any serious altercation between the Alston and New York groups. On Sunday, July 12, 1992, a friend of the Alston group, Renardo "Nardo" Foster, while standing on a street corner, had been shot at, but not hit, by one or more of a group of youths from another neighborhood to the east. It seems that one of the latter group resented the attention which Nardo was paying to a young lady, or, as Nardo perceived it, vice versa. BO was present at that shooting, but did not intervene on behalf of Nardo. Hall, a witness for the State, testified that, following the Sunday shooting, members of the Alston group were angry with BO. Following an incident that occurred on Monday, July 13, the description of which was excluded under a defense motion in limine, Hall began carrying a .32 caliber revolver because he did not know what was going to happen.

The events of the night of July 14, in overview, are that, after a peace overture by the New York group failed, the Alston group assembled and armed themselves in the vicinity of Robert and Brunt Sts., whence they hastened on foot to the northwest corner of Presstman and Division Sts. There, from behind the cover of a large motor vehicle, they opened fire on the New York group who, proceeding on foot northbound on Division St., had almost reached its intersection with Presstman. The murder victim, Ms. Edmonds, was one of four persons seated on the outside front steps of the building at 553 Presstman St., the corner building in the southwest quadrant of the intersection. They were fully within the field of fire commanded from the position of the Alston group on the other side of Presstman St.

On the night of the murder Phyllis Avery, then approximately nineteen years old, was residing with six other persons at her grandmother's house, 556 Robert St., on the north side thereof, between Brunt and Division Sts. She was sitting on the front outside steps talking to Alton "Baldy" Alston, the

brother of the petitioner. D Nice approached, walking westerly along Robert St. from Division, calling out, "Diesel." Two youths (inferentially, Hall and BO) were standing at the intersection of Division and Robert Sts., waiting for D Nice. Baldy identified himself as Diesel's brother and said that D Nice should talk to him, Baldy. Ms. Avery testified, "D Nice told Baldy, '[T]ell your brother we would like to quash this before anybody else gets hurt.'" After Baldy answered, D Nice said, "Well, I guess this means more people getting hurt." D Nice then walked back to Division St. and "went around the corner" with the other two young men. After the conversation Baldy "got up and went down Brunt St."

As Ms. Avery remained seated in front of 556 Robert St., the Alston group and others began to assemble in front of the house "next to" 556 Robert St. Cooper came from Brunt St. with a shotgun in his hand and carrying a bag. Nardo and Porky rode up on a "bike." When they got off the "bike" Porky and Cooper started checking their guns. Porky's weapon was approximately six inches in length. Nardo was giving bullets from a bag to Cooper. At some point a black car with a sun roof arrived, driven by someone whom Ms. Avery could not identify. "Rock" got out of the car. At that point the group consisted of Cooper, Micah, Porky, Nardo, and Rock. Then the group left. Rock and the driver rode in the car around the corner of Brunt St., and the others went around the corner on foot. Ms. Avery estimated that the shooting started approximately twenty minutes after the Baldy/D Nice conversation had ended.

Mrs. Addie Smith and her husband reside at 1911 Brunt St. On the night in question, from within her house, she heard a car park on Brunt St. Looking out, she saw a group of approximately five teenagers. Junior was the only one of them whom she could identify by name. One of the other teenagers was carrying a bag. The shape of the bag indicated to Mrs. Smith that it contained a gun or guns. The group went through the alley behind Mrs. Smith's house (the Central Alley). Mrs. Smith telephoned the police and reported what she had seen. Almost immediately after she hung up the

telephone gunfire erupted. There were, "gun shots every-where. Just lots and lots of gun shots."

Tracy Braxton, then age twenty or twenty-one, was seated on the steps at 553 Presstman St. with Ms. Edmonds, who was feeding her infant son, Eric, and with Takisha Carolina, then fifteen or sixteen years old. Ms. Braxton lived at 561 Presstman, five houses from the Division St. corner, and Ms. Carolina lived in the 2100 block of Division St., north of Bloom St., the next street north of Presstman. They had been seated on the steps for approximately one-half hour when Ms. Braxton saw Alston with Porky, Micah, and Cooper. They were running at a jogging pace eastwardly on the north sidewalk of Presstman St. toward Division. They stopped behind a vehi-cle, identified as a Chevy Blazer, parallel parked, facing westerly, at the north curb of Presstman St. in front of the numbers 552 and 554. Alston was carrying a "real big gun." It was long and black, with an attachment.[3]

Within seconds after the Alston group got to the Blazer, they began shooting. Their shots were the first shots that Ms. Braxton heard. At that point she and her companions began running for her house at 561 Presstman. The shooting continued while they ran westerly on the south sidewalk of Presstman St., while they were trying to get into the house, and after they were in the house.

In the house Ms. Edmonds handed her child to Ms. Carolina and collapsed. Ms. Edmonds had been shot completely through the left arm and chest by a nine millimeter bullet that was recovered under her body. Young Eric had been wound-ed in the right arm.

Takisha Carolina confirmed that Alston and Cooper, with two others, were shooting from behind the truck.

---

**3.** When the members of the Alston group were arrested *en masse* two days later, the police recovered two weapons, one of which was a .22 caliber Charter Arms semi-automatic rifle, Model AR–7 Explorer, to-gether with its detachable magazine capable of holding approximately thirty rounds.

Hall testified that immediately prior to the shooting he, BO, and D Nice were walking northerly on Division St. toward Presstman. Hall was carrying a .32 caliber revolver, BO had a nine millimeter semi-automatic weapon, and D Nice had a small handgun. Hall was in the lead. As soon as he reached Presstman St., the Alston group started shooting. Hall identified Alston as one of the persons shooting at him. Hall ducked behind a car. BO and D Nice ran into Presstman St. and were shooting. Hall ran across Division St. and easterly on Presstman St., shooting as he ran. He fired six rounds, without aiming at anything in particular. BO and D Nice were standing in the middle of Presstman St. firing their weapons while the Alston group was running westbound on Presstman St.

Hall said that after the shooting stopped D Nice was "hyper and pumped up." He stood on the corner "yelling, hopping around like he just had did something that was outstanding."

That same night Corinthin Carolina, a friend of Ms. Edmonds, was seated on the steps at 2106 Division St. with another friend. Based on information that she received from a person who had been walking northbound on Division St., Corinthin Carolina began walking south on Division toward Presstman. She reached the northwest corner of Bloom and Division Sts. when shooting started. She heard "a lot" of shots and saw sparks or gun barrel flashes at Division and Presstman. She ran back to her house and did not venture to Presstman St. until the police had arrived.

Sharlene Braxton, a resident of 561 Presstman St., had been shopping on Pennsylvania Avenue, the street parallel to, and a short block west of Brunt St. With her were her two children, her little brother, and her pregnant girlfriend. As they were walking home on the south side of Presstman St. in the block east of Brunt, the gunfire erupted. She saw "sparks" spraying from the northwest corner of Presstman and Division Sts. There were more than five people there. Two of those persons, standing on the curb side of the Blazer, were firing long guns, braced on the hood of the vehicle. Another man in

the group would rise up from behind the Blazer, shoot, and then duck down again. Ms. Braxton identified the semi-automatic .22 rifle seized by the police as identical to one of the long guns that she saw being fired that night from behind the Blazer.

In their investigation of the crime scene, the police observed the following physical facts. There were two bullet holes in the driver's side of the Chevy Blazer. On the sidewalk behind the Blazer were two live cartridges and one cartridge casing. There was a bullet trajectory mark on the left front of an automobile parallel parked on the north side of Presstman St. in front of No. 560. There was a bullet hole in the rear of a van parked on the north side in front of 564 Presstman St. There was a bullet fragment in the wall of the building at that address. In the bed of Division St., from the midline of Presstman St. south, there were eight cartridges cases, six of which were clustered south of the Presstman St. building line of the building on the southwest corner, but at points from which there was a line of direct sight to the Blazer.

## I

There is no merit to Alston's contention that his conduct cannot be the actual cause of Ms. Edmonds's death. In *Jackson v. State,* 286 Md. 430, 408 A.2d 711 (1979), we sustained the felony murder convictions of two robbers who had taken the robbery victims as hostages in an effort to escape by automobile. At a roadblock a police officer, armed with a shotgun, leapt on the hood of the car. One of the robbers waved a handgun through an open window of a car. In an effort to strike the weapon from the robber's hand, the officer swung the shotgun over the roof of the car. In that process it discharged, killing one of the hostages. We said that the acts of the robbers themselves "produced the intervening cause" of the hostage's death, "and the result is not to be considered remote and was foreseeable." *Id.* at 442, 408 A.2d at 718. *See also People v. Kibbe,* 35 N.Y.2d 407, 362 N.Y.S.2d 848, 321 N.E.2d 773 (1974) (affirming conviction for depraved heart murder of robbers who left highly intoxicated

robbery victim on the shoulder of an unlighted rural road at night in near zero weather, without shoes, stripped of outer clothing, and approximately one-half mile from the nearest shelter. Conduct held to be cause of death when victim, while sitting in roadbed of highway, was struck and killed by a car).

Precedent for the causation element of Alston's conviction for depraved heart murder is also found in drag racing cases in which the gross negligence of racer A is the immediate cause of the death of T, an innocent bystander, and racer B, the operator of a different vehicle in the race, is convicted of manslaughter of T. *See Goldring v. State,* 103 Md.App. 728, 654 A.2d 939 (1995); *Pineta v. State,* 98 Md.App. 614, 634 A.2d 982 (1993).

## II

Alston further argues that, because BO is admittedly the principal in the first degree to the murder of Ms. Edmonds, and because Alston was not aiding and abetting BO, Alston cannot be a principal in the second degree to that murder. The argument rests heavily on Alston's disassociating himself from the New York group, from BO, and from the particular shot that killed Ms. Edmonds. The relevant frame of reference, however, is Alston's participation in the gun battle. Both the Alston group and the New York group were armed and prepared to do battle whenever and wherever their forces encountered one another. When their forces did meet at Presstman and Division Sts., they opened fire, returned fire, and continued to fire in mindless disregard of the lives of the people on the street and in the surrounding houses. Each participant, prior to the actual combat, was willing to use lethal force when the opposing groups met. Each participant manifested depraved heart malice toward non-combatants when the two groups met and sought to kill each other as they previously had determined to do. There would have been no mutual combat, and no murder of an innocent person, but for the willingness of both groups to turn an urban setting into a battleground. In this sense each participant is present, aiding

and abetting each other participant, whether friend or foe, in the depraved conduct.

*People v. Daniels,* 172 Mich.App. 374, 431 N.W.2d 846 (1988), is on point. The setting of the depraved heart murder was a residential street in Detroit during the early hours of a July evening. The defendant went to the home of his cousin, Steven Clark, to collect a debt. They began fighting, and Steven's brother, Gary, joined in. Gary obtained a gun, fired it once into the ground, and struck the defendant in the head with the gun, ending that phase of the events. The defendant then damaged a car parked in front of the Clark house. Steven then damaged the defendant's car. The defendant returned to his car and, while driving it in the direction of the Clark house, Gary fired several shots at the car. Twenty minutes later the defendant drove by the Clark house and fired several shots at it. Gary left the house through the back door, went to the side of the house and returned the gunfire. One of Gary's shots struck and killed a neighbor, Berry, who was washing his car outside of his own house.

The case was tried non-jury. The trial court reasoned that the defendant, the adversary of the principal in the first degree, would have been guilty of depraved heart murder but for the antecedent provocation. A judgment of guilty of manslaughter, entered by the trial court, was sustained on appeal as voluntary manslaughter. The appellate court approved the following analysis by the trial judge:

> "The trial court found that defendant was the driver of the blue car and that Gary Clark fired the shot that resulted in Berry's death, but that defendant and Gary Clark were equally culpable for holding their shoot-out on the residential street where it was likely that other people could be shot and killed. The trial court also found that the shoot-out was mutually agreed to by defendant and Gary Clark and that defendant, at a minimum, intended to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result of his act. Although the court found this intent sufficient to make the killing murder in the second degree, the court

entered a verdict of [ ]voluntary manslaughter because the court was not satisfied that the prosecution proved that the mitigating circumstance of provocation did not exist in light of the evidence of the beating defendant underwent and the shots fired during his first encounter with the Clarks."

431 N.W.2d at 848.

The same reasoning was employed in *March v. Florida,* 458 So.2d 308 (Fla.App.1984). The shoot-out in that case was the culmination of a "turf" dispute between drug traffickers in which a bystander was killed. Two participants were on one side of the shoot-out, using handguns, and a third participant was on the other side, firing a rifle. All were charged with murder in the second degree and convicted of manslaughter. The two handgun wielders contended that the evidence was insufficient to convict them of manslaughter because the victim was killed by the rifle wielding participant. The Florida court responded:

"There is no merit to this contention. Because all three parties were engaged in the same felonious activity (the shootout) their participation in the episode would have been sufficient to support a finding that they were aiders and abettors to second degree murder, so the evidence was sufficient to support the conviction of the lesser offense of manslaughter."

*Id.* at 309.

In his brief Alston places heavy emphasis on *Campbell v. State,* 293 Md. 438, 444 A.2d 1034 (1982). The holding of *Campbell* resolves an aspect of the law of felony murder. The issue was whether under "Maryland's so-called 'felony-murder' statute, the killing of a co-felon during an armed robbery, by either a police officer attempting to apprehend him, or by a victim resisting the armed robbery, constitutes murder in the first degree on the part of the surviving felon." *Id.* at 439, 444 A.2d at 1035. Finding persuasive a line of cases that applied an "agency" theory in lieu of a "proximate cause" theory, we answered the issue in the negative. There is no inconsistency

between the holding of *Campbell* and our holding in the matter before us.

One of the agency theory cases relied upon in *Campbell* was *People v. Washington,* 62 Cal.2d 777, 44 Cal.Rptr. 442, 402 P.2d 130 (1965). *See Campbell,* 293 Md. at 443, 446, 450, 444 A.2d at 1037, 1039, 1041. In *Washington,* Chief Justice Traynor, speaking for the Supreme Court of California, placed the agency theory limitation on felony murder in perspective, saying:

"[W]hen the defendant ... intentionally commits acts that are likely to kill with a conscious disregard for life, he is guilty of murder even though he uses another person to accomplish his objective.

"Defendants who initiate gun battles may also be found guilty of murder if their victims resist and kill. Under such circumstances, 'the defendant for a base, anti-social motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death' ..., and it is unnecessary to imply malice by invoking the felony-murder doctrine. To invoke the felony-murder doctrine to imply malice in such a case is unnecessary and overlooks the principles of criminal liability that should govern the responsibility of one person for a killing committed by another."

44 Cal.Rptr. at 445–46, 402 P.2d at 133–34 (footnote and citations omitted).

In the instant matter the evidence would support a finding that the Alston group initiated the shoot-out. The Alston group rejected a peace overture, ran to intercept the New York group, and shot first. We need not rest our decision on that ground, however, because the facts here demonstrate the tacit agreement of each group to participate in the gun battle.

At oral argument in this Court, Alston cited *Commonwealth v. Gaynor,* 538 Pa. 258, 648 A.2d 295 (1994), in answer to a question from the bench suggesting that the instant matter presented concert of action between the two groups to engage in a "rumble." In *Gaynor* two youthful males had argued

violently outside of a video store in Philadelphia. Each left the scene, armed himself, and returned. They fired shots at one another across the length of the store. A bystander was killed by a shot fired by Gaynor's adversary. The trial court convicted Gaynor of murder in the first degree, reasoning that "[e]ngaging in 'mutual combat' with intent to kill 'provides the malice necessary for murder.'" 648 A.2d at 297. The Supreme Court of Pennsylvania sustained the conviction under a Pennsylvania statute dealing with transferred intent.

With respect to the trial court's theory of first degree murder, the Supreme Court of Pennsylvania said:

"We agree that on these facts the two actors were neither accomplices to each other nor co-conspirators in any acceptable sense.[5] Plainly they were enemies in an adversarial relationship. Shared intent, therefore, was impossible on these facts."

*Id.* at 298. In its footnote five the court found "troubling" the trial court's characterization of the shoot-out as a duel, pointing out that "[a]t common law, such combat with deadly weapons was usually carried out by pre-arrangement and in conformity with agreed or prescribed rules." *Id.* at 298 n. 5.

In the instant matter, it is true that the antagonists did not proceed pursuant to a written code of honor. Compare W. Schwartz, et al., *The Duel: Can These Gentlemen Be Acting Efficiently?*, 13 J. Legal Studies 321, 321–25 (1984). Nor is there any evidence of an expressly articulated agreement for mutual combat. Nevertheless, the Baltimore City jury in this case had sufficient evidence from which it could find that all of the participants, driven by an unwritten code of macho honor, tacitly agreed that there would be mutual combat. The conclusion is supported by the evidence that the trouble began on Sunday, that following the events of Monday, Hall found it necessary to go about armed, that D Nice fatalistically observed that more people would be hurt, and that the Alston group used the vicinity of Robert and Brunt Sts. as a staging area for the impending battle. Though the groups were

adversaries at one level of analysis, at the level of analysis relevant to depraved heart murder, each group aided, abetted, and encouraged the other to engage in urban warfare.

For these reasons, we affirm.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.*