698 A.2d 1121

**In re Eric F.**

**No. 1301, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Aug. 27, 1997.

510

John L. Kopolow, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Joseph I. Cassily, State's Attorney for Harford County, Bel Air, on the brief), for appellee.

Submitted before CATHELL and SONNER, JJ., and JOHN J. BISHOP, Judge (retired), Specially Assigned.

SONNER, Judge.

This case involves the tragic death of a fifteen-year-old girl, Tiffany Fouts, after she had been drinking with her teenaged friends. One of those teenagers, appellant Eric F., dragged Tiffany to the woods behind his house, while she was unconscious, so that his mother would not discover her and so that she would not "mess up" the house with vomit. The night was cold and rainy; appellant clothed himself in a warm jacket, while leaving Tiffany, who was only partially clothed, to die of hypothermia in the woods.

The Circuit Court for Harford County, sitting as a Juvenile Court (Whitfill, J.), found the fourteen-year-old appellant delinquent after determining that he committed acts which, had

he been an adult, would have constituted depraved heart murder. The court committed appellant to the Department of Juvenile Justice. Two questions are presented on appeal:

I. Did the trial court err in denying appellant's motion to suppress his statement to Corporal Cole?

II. Was the evidence sufficient to support a finding of depraved heart murder?

### *Facts*

On November 11, 1995, Tiffany Fouts and her friend Melanie went to appellant's house, where they drank alcoholic beverages with appellant and three other boys: Dante, Lewis, and Ricky. During the course of the evening, Lewis had sex with Tiffany, and Melanie had sex with appellant. Tiffany had consumed approximately one bottle of fortified wine within an hour, and soon became unconscious. While she was unconscious, Ricky also had sex with Tiffany until the other boys told him to stop.

Appellant testified that Lewis directed the boys to carry Tiffany outside to the porch after she began to vomit. The boys went back into the house "because it started raining." Appellant admitted that he later dragged Tiffany to the woods because he thought that she was still too close to the house. Some time within the next half hour, appellant said that Dante went out to check on Tiffany, and suggested to appellant that he call 911, but that appellant said no "because I knew it would be a whole bunch of like police cars and stuff, and I didn't want them coming to the house." Dante, instead, called the sheriff and gave an incorrect address that appellant had given him because appellant did not want the police coming to his house. Appellant testified that, "I thought it was close to, you know, where she was at."

Appellant testified that he had wanted to check on Tiffany once more that evening and wanted to bring her back to the basement, but that his mother forbade him to leave the house. Appellant did not tell his mother why he wanted to go outside. Appellant then went to bed after his mother did, without ever

checking on Tiffany. Melanie testified that appellant called her several hours after she and Lewis left the house. She claimed he told her that they had contacted the police and that he and another boy had urinated on Tiffany.

The weather on the night of November 11th was rainy and windy, with a low temperature of 34 degrees. Tiffany's body was found by neighbors the next morning, in the woods behind appellant's home. She was clothed in "a little top and panties and socks," and the panties were below the knees. According to medical testimony, Tiffany died of hypothermia and acute alcohol intoxication, although the intoxication, alone, would not have killed her.

Sergeant J.R. Taylor arranged for appellant's mother (Ms. F.) to bring the victim's jacket to his office and to bring appellant in to take a collection of samples. While appellant and his mother were at the police station, Corporal Paul Cole took the opportunity to interview appellant; he had already interviewed other witnesses.

Appellant testified that he was never forced to talk to any of the police officers, and that Cole, in particular, told him that he did not have to speak to the police. He stated that he spoke to Cole because he believed he had nothing to hide.

Cole testified that he asked Ms. F. for permission to interview appellant by himself, while she watched and listened via a monitor, and she agreed. He then asked appellant, in his mother's presence, if he would be willing to speak with him alone, on tape, and appellant agreed. Appellant appeared "coherent" and not under the influence of drugs or alcohol. Cole did not give appellant *Miranda* [1] warnings.

Cole further testified that, before taking appellant into the interview room, he asked if he wanted anything to drink. Cole wore his gun, but appellant was not handcuffed, nor were there guards at the door. Appellant, Cole, and Detective Tom Walsh were present.

---

**1.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Cole began by offering breaks whenever appellant needed them. He also told appellant that "after we're done, regardless of what we discuss here tonight you'll be going home with your mom." Appellant then provided a statement about the incident, in which he acknowledged that the weather was "cold rain" and "windy." When asked what he thought would happen to Tiffany, appellant replied, "I told [the other youths] had they ever heard of hypothermia. . . ."

Walsh also questioned appellant, after telling him that he was the last person to be interviewed, "so we kind of have a real good idea of what we think happened there." Appellant told Walsh that he saw Lewis throw a weight in Tiffany's direction, and argued with Ricky about whether it did or did not hit her head. He also stated that he discussed with his friends the possibility that Tiffany would die unless she got help and said, "I was like if we don't go back and get her she['s] probably going to freeze to death." He acknowledged wearing a jacket outside because "it was real cold."

Appellant's mother testified at the suppression hearing that, when she took appellant to the Sheriff's office the next day, she did not ask Corporal Cole whether she needed a lawyer, and he did not bring up the subject. She acknowledged that she told appellant to cooperate with police, but said that no one told her that her son might be charged with a crime as a result of his statement. Ms. F. testified that Taylor and Cole told her repeatedly that her son would not be charged.

Testifying in rebuttal, Cole and Taylor denied ever telling Ms. F. that her son would not be charged. Taylor added that he "may have told her he would not be arrested that day, which was correct. I had no intention of arresting anybody on initial contact."

## I.

In our review of the denial of a motion to suppress, we look at the facts adduced at the suppression hearing in the light most favorable to the State, and extend great deference to the fact finding of the suppression hearing judge with

respect to weighing and determining of first-level facts. *Matthews v. State*, 106 Md.App. 725, 732, 666 A.2d 912 (1995). As to concluding whether an action taken was proper, however, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Id.*

### *Custody*

Initially, we must examine whether appellant was in the custody of police when Cole interrogated him. In a custodial situation, *Miranda* warnings are required. *In re Shannon A.*, 60 Md.App. 399, 483 A.2d 363 (1984), *cert. denied,* 302 Md. 570, 489 A.2d 1129 (1985). *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Cole testified that he did not inform appellant of his *Miranda* rights "because it wasn't a custody thing."

The Court of Appeals in *Whitfield v. State,* 287 Md. 124, 140, 411 A.2d 415 (1980), *cert. dismissed,* 446 U.S. 993, 100 S.Ct. 2980, 64 L.Ed.2d 850 (1980), stated:

[T]he custody requirement of *Miranda* does not depend on the subjective intent of the law enforcement officer-interrogator but upon whether the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation ... [A court should look to] how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

(citations omitted). In juvenile cases, courts may apply a wider definition of custody for *Miranda* purposes. *In re Lucas F.,* 68 Md.App. 97, 103, 510 A.2d 270, *cert. denied,* 307 Md. 433, 514 A.2d 1211 (1986). In *Lucas,* the police interroga-

ted a ten-year-old child whom they had picked up as a runaway and transported to a police station. They did not inform him that he was free to leave, nor did they tell him that his mother was in the stationhouse waiting room. The court found that the child was in custody for *Miranda* purposes because he "reasonably perceived himself to be in the custody of the police." *Id.*

■ After reading the transcript of appellant's encounter with Cole, the motions court found:

> There is no doubt that [appellant] was never in custody at the Sheriff's Department. Corporal Cole made it clear to [appellant] that he was free to leave at any time, and [appellant] fully understood this.

The motions court also concluded that the Cole's statement that appellant could go home with his mother that night was "an assurance to [appellant] that the questioning was not custodial."

At the hearing on appellant's motion to suppress, Cole testified that, at the time they interviewed appellant, "we didn't know for sure what the cause of death was and we had no plans of charging that evening anyway, regardless of what he had told us." Cole stated that he had not, at that time, ruled out natural causes for Tiffany's death. He also testified that appellant was free to leave and discontinue questioning. On cross-examination, Cole answered yes when asked, "If he would have told you he killed the girl, would you have let him walk out the door that day?"

Our own independent constitutional appraisal of this case, after reviewing the law and applying it to the facts, is that the trial court properly found that appellant was not in the custody of police when the officers interviewed him.

### Voluntariness

■ Next, we examine whether the confession was voluntary. Even if appellant was not in custody, the confession obtained during a noncustodial interrogation is presumptively inadmissible, unless it is shown to be free of coercion. A

statement is involuntary if it is induced by force, undue influence, or improper promises. *Hof v. State,* 337 Md. 581, 655 A.2d 370 (1995). To determine whether a statement was given freely and voluntarily, the court looks at the totality of circumstances, including where the interrogation was conducted, its length, who was present, how it was conducted, whether the defendant was given *Miranda* warnings, the mental and physical condition of the defendant, the background of the defendant, and whether the defendant was physically or psychologically mistreated. *Id.* at 595–597, 655 A.2d 370.

Appellant asks that we find his statement involuntary based on two factors: that "the police ... left his parent misinformed as to the need for counsel and ... exploited [his] desire to go home by keeping him and his mother ignorant of the gravity of the situation."

Appellant's first contention, that his mother was misinformed as to the need for counsel, stems from a statement made by appellant to police at his house on the day Tiffany's body was found. Appellant's mother testified that she "was concerned about the legalities of it, of course, and asked that did I need a lawyer, and it was, no, nothing was known yet." Appellant was initially interrogated at his home, at which time, his mother testified, she had asked whether appellant needed a lawyer. The statement made at the house, however, is not being challenged on appeal.

As to the stationhouse statement, appellant's mother did not bring up the subject of lawyers. Cole was cross-examined as follows:

[Defense Counsel]: Did you, at anytime, tell him that he might want to talk to a lawyer because you were investigating what you believed to be a crime and something he said might come back to be used against him if he was implicated?

[Corporal Cole]: Not during this statement.

[Defense Counsel]: Before, when you were asking him for a drink, do you recall discussing it with him, telling him he had any kind of right to that?

[Corporal Cole]: No. We didn't discuss lawyers before the statement or during the statement.

[Defense Counsel]: Did you discuss lawyers with his mother and her boyfriend before you talked to Eric that night?

[Corporal Cole]: I really don't recall because there was a lot of different people involved in this. I know that we did—I know some of the parents had asked me about attorneys. I am not sure exactly who asked me what. I can say that I didn't talk to Eric about it before the interview or during the interview.

Appellant's argument that his mother was misinformed as to the right to counsel has no merit because the matter was not discussed on the day of the challenged statement, and the police had no duty to inform her of the need for counsel at a noncustodial stationhouse interrogation.

■ Appellant's second argument concerns Cole's assurance that he could go home with his mother that night, regardless of what happened in their discussion. He argues that this assurance induced him to make an involuntary statement because it deceived him as to the gravity of the situation. The motions court, however, found that Cole's statement that appellant could go home was made after appellant had already agreed to talk. Moreover, the court found that Cole's assurance was "merely a statement of a true fact," because appellant *did* go home with his mother that night. The motions court also gave weight to appellant's own testimony that he spoke with the police because he believed he had nothing to hide. In its ruling, the motions court also considered the voluntariness of appellant's statement in light of the totality of the circumstances under which it was given: the location and duration of the interview, the presence of appellant's mother in a nearby room, his mental and physical condition, age, experience, education, intelligence and any evidence of physical or psychological mistreatment or intimidation by police. The court concluded:

The only factors weighing against a finding of voluntariness is the bald fact that [appellant] was fourteen years old and that he was being questioned by two officers in a room at the police station. These factors, however are overridden by the fact that, as we have discussed, the officers made it unmistakably clear to [appellant] that he could leave the station at any time and that he did not have to say anything at all, and that [appellant] spoke to police based on his belief that he had nothing to hide.

Our independent review of the law, as applied to the facts of this case, leads us to find that the trial court did not err in determining that appellant was not in a custodial situation and that his confession was voluntary.

## II.

In reviewing the sufficiency of the evidence that a juvenile has committed a delinquent act, we must determine whether the evidence, adduced either directly or by rational inference, enabled the trier of fact to be convinced beyond a reasonable doubt that the juvenile committed the act. *In re George V.*, 87 Md.App. 188, 193, 589 A.2d 521 (1991). We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *In re Timothy F.*, 343 Md. 371, 380, 681 A.2d 501 (1996). We give due regard to the trial court to assess the witnesses' credibility. *Wiggins v. State*, 324 Md. 551, 567, 597 A.2d 1359 (1991), *cert. denied*, 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992).

The essential element of depraved heart murder is that the act in question be committed "under circumstances manifesting extreme indifference to the value of human life." *Robinson v. State*, 307 Md. 738, 517 A.2d 94 (1986). "The question is whether the defendant engaged in conduct that created a very high risk of death or serious bodily injury to others." *Alston v. State*, 101 Md.App. 47, 57, 643 A.2d 468

(1994), *aff'd,* 339 Md. 306, 662 A.2d 247 (1995). The murder "may be perpetrated without the slightest trace of personal ill-will." *Glenn v. State,* 68 Md.App. 379, 399, 511 A.2d 1110, *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986). Instead, "the willful doing of a dangerous and reckless act with wanton indifference to the consequences and perils involved, is just as blameworthy, and just as worthy of punishment, when the harmful result ensues, as is the express intent to kill itself." *Alston,* 101 Md.App. at 56, 643 A.2d 468.

An act of omission can be the basis for depraved heart murder. In *Simpkins v. State,* 88 Md.App. 607, 608, 596 A.2d 655 (1991), *cert. denied,* 328 Md. 94, 612 A.2d 1316 (1992), this Court held that a parent's denial of food and care to a child for three to five days, resulting in the child's death from malnutrition and dehydration, constituted depraved heart murder. The *Simpkins* court cited an early English case, *Regina v. Walters,* 1841, Car. & M. 164, which stated:

> If a party do any act with regard to a human being helpless and unable to provide for itself, which must necessarily lead to its death, the crime amounts to murder. . . . But if the circumstances are not such, that the party must have been aware that the result would be death, that would reduce the offence to the crime of manslaughter. . . .

*Simpkins,* 88 Md.App. at 613, 596 A.2d 655. Determining that an act of omission was knowing and willful is key in a finding of murder as opposed to manslaughter. *Id.* at 618, 596 A.2d 655.

In this case, appellant contends that the evidence was insufficient to convict him of depraved heart murder because he did not demonstrate extreme indifference to Tiffany's life. In support of this contention, he states that he and his friends took Tiffany outside in the hope that the rain would "wake her up," that he was the first to say an ambulance should be called, and that he brought Dante the phone book so that he could call for help. Although he deliberately gave Dante the wrong address, he argues that "it was close enough to his own address ... to enable the officers to find her." He also

argues that he and Ricky were on their way outside to check on Tiffany when his mother stopped them.

This summary omits evidence that appellant urinated on the unconscious girl and laughed about it, joked about her condition, clothed himself for the cold, rainy weather while leaving Tiffany outside nearly naked, and failed to inform his mother, even though he knew that "if we don't go back and get her she['s] probably going to freeze to death."

Appellant also indicated his indifference toward Tiffany's very dangerous situation by being more concerned about getting caught drinking than about the lack of probability of Tiffany's survival under such dangerous conditions. This resulted in his refusal to call 911 or give the correct address so that an ambulance could find her. In the case of *Commonwealth v. McLaughlin,* 293 Pa. 218, 142 A. 213 (1928), the court held that a defendant's conduct in driving his fatally injured victim to the hospital after driving his car in a way that created great risk negated the "hardness of heart" required for depraved heart murder. In this case, appellant made no such attempt.

Moreover, although appellant alleges that he would have gone outside to bring Tiffany back into the basement if his mother had not stopped him, he fails to mention why he did not again attempt to bring her back in after his mother had gone to sleep. Instead, shortly after appellant's mother went to bed, appellant also went to sleep, leaving Tiffany outside, exposed to the elements, to die.

Appellant also argues that *Simpkins* is distinguishable because the defendant in that case had a legal duty to care for his child because he was her parent. This argument is without merit. Appellant's indifference toward Tiffany is manifest by his placing Tiffany outside in the cold, dragging her to the woods, and leaving her there in an unconscious state. Appellant placed her in a dangerous situation and, therefore, clearly indicated his total lack of regard for her well being, considering the dangerous state in which she was placed in the sub-freezing cold.

After giving due regard to the trial court, which had the opportunity to interact with appellant and to assess his credibility, we find that the trial court had sufficient evidence before it to find that appellant knew that his actions would lead to Tiffany's death, and that he manifested extreme indifference to the value of her life by leaving her in the cold, and failing to seek appropriate help.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**