## BENNETT *v.* STATE

[No. 165, September Term, 1962.]

*Decided February 6, 1963.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, HORNEY and SYBERT, JJ.

*John C. Sullivan* for appellant.

*Robert C. Murphy, Deputy Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *James S. Getty, State's Attorney for Allegany County,* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

Challenging the correctness of the instructions to the jury with respect to the law of self-defense, the defendant (Garnette Mae Bennett) has appealed from the judgment entered on the verdict of guilty of murder in the first degree without capital punishment.

The defendant shot and killed her husband with a shotgun in the midmorning of January 31, 1962. She did not deny the shooting, but claimed that it was done in self-defense. The victim and the defendant had married and lived together for nearly twenty years, and had had four children—a daughter who lived away from home and three sons who lived with their

parents. But the marriage had been a turbulent one in that it was fraught with frequent arguments and bickerings; beatings of the wife by the husband; and at least one act of infidelity on the part of the wife.

Early in January of 1962, the couple agreed to separate, he to move out of the marital abode: she to remain therein with the teenage boys. But after the expiration of a fortnight the husband moved back in with his family. As a result, the strained relations between them became even more intensified, and the wife, several days before the homicide, filed a bill for an absolute divorce and a preliminary order to require the husband to leave the home forthwith. When the husband learned of these proceedings, he became enraged and, on both of the two days before the shooting, threatened to take custody of the children and kill his wife. Whereupon she asked two of her sons to show her how to load and handle the gun (ostensibly for the purpose of shooting rats) and subsequently purchased shells for it.

When the husband came home from work at the usual time (about 7:20 a.m.) on the day of the homicide, he went to one of the bedrooms and while he was gone, the wife loaded the shotgun but left it in the gun rack in the kitchen. After the children went off to school, the husband, following a brief argument, went out to purchase whiskey, and, upon his return, he resumed the argument concerning the divorce and custody of the children, but he did not then threaten to kill his wife as he had done on the two preceding days. He cursed her, however, and walked out of the kitchen momentarily into the hallway. While he was out of her presence, the wife took the loaded gun out of the rack and held it by her side where she was standing behind the kitchen table. When the husband returned to the kitchen, he had his jacket over his left arm and a large hunting knife in his right hand. According to the wife, he had a hateful look on his face, and, because she was afraid that he would lunge at her or get her off guard and throw the knife at her, she pointed the gun toward him and pulled the trigger. The discharge struck the husband in the chest. He staggered forward and fell faceward on a chair. And when the wife came to his side he was dead.

In a statement given by the defendant to the investigating officers, the defendant, in reply to a question as to how her husband was dressed at the time of the shooting, in addition to informing them that he had the jacket over his arm and the knife in his hand, further stated: "I already had the gun loaded and he just stopped and stared at me, and I pointed the gun toward him and shot and he yelled 'Oh, Garnette' or 'No, Garnette,' and then he staggered toward me and fell against the chairs at the table." The defendant further admitted that she had discarded one of the two shells purchased by flushing it down the toilet. The State also produced photographs showing the position of the hunting knife partially covered by the jacket on the floor inside the kitchen door.

There was also other evidence on behalf of the defendant to the effect that the deceased, who often drank to excess, had bruised the defendant about the arms and body on several occasions; that he had beaten her from time to time throughout the marriage; that on one occasion he had held a knife to her throat and tried to kill her; that he had been heard to say on more than one occasion that he had cut her throat once and would do it again; and that, within the last two days prior to his death, the deceased had made repeated statements to others that he hated the defendant and would like to cut her heart out and watch it bleed.

At the close of the evidence, the defendant asked the trial court, in four separate written requests, to instruct the jury on the law of self-defense. In the first proposed instruction there was a request that the court advise the jury that if it found the defendant had reasonable grounds to believe, and did in fact believe, that she was in imminent danger of suffering serious injury, or death, at the hands of the deceased at the time she shot and killed him, and further found that any reasonable and prudent person in a similar situation and under like circumstances would have so believed, then the defendant was entitled to be acquitted. The second request sought an instruction to the effect that if the defendant had reasonable grounds to believe that her husband intended to kill her or to do her serious bodily injury, then she had a right under the circumstances to arm herself in anticipation of an assault. The third

request was for an instruction that the jury be informed that when peril or danger exists a person has a right to defend and protect himself and that, when the peril is imminent, he who is assaulted need not retreat but may stand his ground. And the fourth request asked that the jury be told that it is not necessary that the danger be actual or real or about to transpire but that one may act in self-defense on appearance alone.

The trial court instructed the jury generally as to the law of homicide and the defenses thereto, and, in so doing, the court granted the first requested instruction, by including it in its written charge to the jury. Likewise, the substance of the third and fourth requests were fairly covered by the instructions. But, although the court indicated that it believed that the second requested instruction was sufficiently covered in the instructions, it is clear that it did not specifically advise the jury, as it should have done on the evidence in this case, that the defendant had a right to arm herself in anticipation of an assault.

There was evidence from which the jury could find, as it did, that the killing of the deceased was wilful, deliberate and premeditated, but there was also other evidence tending to show circumstances of alleviation, excuse or justification, from which the jury, had it been fully and correctly advised as to the law of self-defense, might have found a different verdict. Where there is evidence, as there was in this case, to support the theory that the homicide was excusable or justifiable, or that the weight or force of the evidence might be lightened or lessened, the court should have fully instructed the jury as to the law of self-defense in compliance with the request therefor. *Bruce v. State,* 218 Md. 87, 145 A. 2d 428 (1958). See also *Hardison v. State,* 226 Md. 53, 172 A. 2d 407 (1961).

Since the decision in *Gunther v. State,* 228 Md. 404, 179 A. 2d 880 (1962), the right of a defendant to arm himself in anticipation of an assault can no longer be questioned where the circumstances are such as could induce a jury to believe that the defendant was not the aggressor, but was instead apprehensive that he might be attacked by the victim. See also *State v. Bristol,* 84 P. 2d 757 (Wyo. 1938) ; *Allen v. United States,* 157 U. S. 675 (1895) ; *Thompson v. United States,* 155 U. S. 271 (1894) ; *Gourko v. United States,* 153 U. S. 183 (1894).

And see Hochheimer, *Crimes and Criminal Procedure* (2nd ed.), § 344; *Perkins on Criminal Law,* p. 48; Wharton, *The Law of Homicide,* § 324.

It follows from what has been said that the judgment must be reversed and a new trial awarded if the question presented on appeal was properly reserved for appellate review.

The purpose of Maryland Rule 756 f—which requires that objections to instructions shall be made before the jury retires to consider its verdict—is to give the trial court an opportunity to amplify or amend its charge if it deems amplification or amendment necessary. *Noel v. State,* 202 Md. 247, 96 A. 2d 7 (1953). See also *Wash. Sub. San. Comm. v. Musgrove,* 203 Md. 231, 100 A. 2d 27 (1953); *State, Use of Bowman v. Wooleyhan Transport Co.,* 192 Md. 686, 65 A. 2d 321 (1949). The cases hold that the objection to which appellate review is restricted is that made after the charge is delivered to the jury. Cf. *Ritterpusch v. Lithographic Plate,* 208 Md. 592, 119 A. 2d 392 (1956). And see *Belt's Wharf v. International Corp.,* 213 Md. 585, 132 A. 2d 588 (1957). Moreover, a defendant in a criminal case who desires to except to jury instructions is required to make reasonable objection thereto. *Briley v. State,* 212 Md. 445, 129 A. 2d 689 (1957). But substantial compliance with the requirements of the rule has been held to be sufficient to preserve the right to a review. See *Merritt v. Darden,* 227 Md. 589, 176 A. 2d 205 (1962).

In the instant case, where the requests for instructions were submitted to the court in writing and written instructions to the jury were prepared by the court and were discussed in chambers with counsel for both parties before the charge was read to the jury in open court, it is clear that the trial court was fully aware of the particular instruction the defendant desired the court to give, for, in rejecting the second request, the court noted in writing thereon that it was "sufficiently covered in [the] court's instructions." Moreover, the record discloses that the defendant not only objected then and there to the denial of the second requested instruction but also excepted to the refusal of the court to read it to the jury. And while no further exceptions were made to the prepared charge after it had been read to the jury, there was in this case no reason to

repeat in the court room what had already been said and re-corded by the reporter in chambers.

In addition to this it appears that the trial court and counsel for the State, as well as counsel for the defendant, not only believed but subsequently recognized that the defendant had made an effective objection. That this is true is borne out by the fact that the court, on the motion for a new trial, heard arguments by counsel for and against the claim that a new trial should be granted because the court erred when it denied the second requested instruction.

We think that the objection or exception the defendant made was substantial compliance with the requirements of the rule, and that what was done in this case was sufficient to preserve the right of the defendant to a review by this Court under Rule 756 f. *Merritt v. Darden, supra.*

With this holding it is unnecessary to consider whether the trial court erred when it allowed the State's Attorney to argue matters extraneous to the evidence.

*Judgment reversed and case remanded for a new trial.*

HAMMOND, J., dissents.