759 A.2d 327

**Nathaniel Damian MARR**

v.

**STATE of Maryland.**

**No. 2587, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Sept. 11, 2000.

154

George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Jack Johnson, State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before MOYLAN, EYLER and STEPHEN P. JOHNSON (Specially assigned), JJ.

EYLER, Judge.

Nathaniel Damian Marr, appellant, was convicted by a jury sitting in the Circuit Court for Prince George's County of attempted second degree murder and use of a handgun. He was sentenced to consecutive terms of imprisonment of thirty and twenty years.

## Questions Presented

1. Did the trial court err in denying the motion to suppress Appellant's statements to the police?
2. Did the trial court err in denying Appellant's motion for a mistrial and in refusing to reopen the suppression hearing?
3. Did the trial court err in refusing to give requested instructions?

 A. Did the trial court err in refusing to instruct the jury that a defendant does not forfeit his right to self-defense by arming himself in advance if he does not seek

the encounter and has reason to fear an unlawful attack on his life?

B. Did the trial court err in refusing to instruct the jury on [its] duty to assess reasonableness from the defendant's perspective at the time of the incident?

## Facts

### Motion to Suppress

The facts, as developed at the hearing on appellant's motion to suppress, are in substance but not verbatim taken from appellant's brief.. On December 4, 1998, Prince George's County detectives obtained an arrest warrant for appellant in connection with the attempted murder of Kevin Jackson on that same date. Police detectives "held" the warrant, which meant the warrant was not entered into the computer. One of the reasons given by the detectives for holding the warrant was to "prevent the attorney from coming in and assisting the defendant."

On December 14, 1998, Detective Norman Miller received a telephone call from Steve Kupferberg, Esquire, who had represented appellant over a number of years in a number of cases, and who had been retained in December 1998, to represent appellant in connection with the investigation of crimes in the Seat Pleasant area. In that conversation, Mr. Kupferberg told Detective Miller that he represented appellant, inquired as to the existence of an arrest warrant, and indicated that if there were an outstanding warrant, appellant would turn himself in to police. Mr. Kupferberg made it clear to Detective Miller that appellant did not want to talk to police officers without Mr. Kupferberg being present. Detective Miller, although he knew that an arrest warrant was outstanding, did not inform Mr. Kupferberg of the warrant.

Later that same day, Mr. Kupferberg faxed Detective Miller a letter confirming the telephone conversation, wherein Mr. Kupferberg confirmed that he represented the appellant and repeated his statement that, if a warrant were issued, appellant would turn himself in to police. Mr. Kupferberg also

repeated appellant's position that appellant would make no statement to police officers without his attorney being present, and Mr. Kupferberg asked Detective Miller not to question appellant outside of his presence. Mr. Kupferberg testified that he had discussed the letter with appellant and advised appellant that if he were arrested without Mr. Kupferberg being present, he should tell the police that he did not want to make a statement.

On December 28, Mr. Kupferberg met with Ranganoff Manthrapagada, a member of the U.S. Attorney's Office and a former Assistant State's Attorney. Mr. Kupferberg told Mr. Manthrapagada that he wanted appellant to turn himself in if there was an outstanding warrant and asked him to find out if there was one. Mr. Manthrapagada told Mr. Kupferberg that he would not do so.

On December 30, at approximately 8:30 a.m., appellant was arrested pursuant to the warrant issued on December 4. Appellant and the arresting officer were in appellant's apartment, the place where he was arrested, until 11:00 a.m., when homicide investigators arrived. Appellant was transported to the Criminal Investigation Division Office and placed in an interview room. Appellant was alone in that room from 11:20 a.m. until 1:00 p.m.

From 1:00 p.m. until 2:00 p.m., appellant was questioned by Detective Troy Harding about the murder of Arthur Carroll and other shootings in the Seat Pleasant area. According to Detective Harding, appellant waived his *Miranda*[1] rights. Appellant was alone for approximately 20 minutes, but Detective Harding went back into the interview room at 2:20 p.m.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda,* the Supreme Court of the United States determined that in order to effectuate a suspect's Fifth Amendment privilege against self-incrimination, the suspect must be told that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of counsel, and that counsel will be appointed if he cannot afford an attorney. *Id.* at 479, 86 S.Ct. 1602.

and questioned him until 2:40 p.m. Detective Harding testified that appellant did not ask to talk to a lawyer.

Other than a trip to the bathroom, appellant was alone in the interview room from 2:40 p.m. to 7:50 p.m. From 7:50 p.m. to 8:35 p.m., he was questioned by Detective Joseph McCann about several shootings, including the Arthur Carroll murder. Appellant executed a written waiver of his *Miranda* rights.

Except for another trip to the bathroom, appellant was alone in the interview room from 8:35 p.m. until 11:40 p.m. At 11:15 p.m., he appeared to be sleeping. From 11:40 p.m. until 12:40 a.m. on December 31, appellant was questioned by Detective Whitaker. From 12:59 a.m. to 2:04 a.m., appellant was questioned by Detective Dwight DeLoatch. At 2:10 a.m., Detective McCann returned to the interview room. Detective McCann confronted appellant with information to the effect that Curtis Alston had confessed to his involvement in the Arthur Carroll murder and had provided information relating to other murders in the Seat Pleasant area. After being confronted with that information, appellant made an oral statement in which he acknowledged that he and Curtis Alston shot Carroll. Appellant then gave a written statement which concluded at 3:45 a.m. Detective McCann continued to question appellant about other shootings, including Kevin Jackson, until 4:30 a.m. Detective McCann, knowing about Mr. Kupferberg's letter to Detective Miller, testified that appellant never asked to talk to a lawyer, including Mr. Kupferberg.

From 9:30 a.m. to 5:00 p.m. on December 31, appellant was questioned by Detective Ismael Canales. Appellant executed another written waiver of his *Miranda* rights and wrote on the waiver, "I would like to stay and continue to talk with this investigator." Detective Canales testified that he believed the note was necessary because the officers wanted to make sure that appellant did not mind continuing to talk. This episode of questioning produced four written statements concerning other shootings. Appellant was presented to the commissioner at 8:00 p.m. on December 31, almost 36 hours after his arrest.

Appellant testified that he and Mr. Kupferberg discussed Mr. Kupferberg's telephone conversation with Detective Miller, the letter that Mr. Kupferberg faxed to Detective Miller, and that Mr. Kupferberg had advised him that he should not make a statement but should ask for his attorney. Appellant testified that he told Detective Harding at least three times that he wanted to talk to Mr. Kupferberg, but Detective Harding told him that he could not make a phone call because Mr. Kupferberg was representing appellant's uncle and would not be able to represent appellant because it would be a conflict of interest. At about 8:00 p.m. on December 30, according to appellant, he told Detective McCann that he did not want to talk without his lawyer present. He explained that he signed the *Miranda* waiver forms because he had been in the interviewing room so long and had repeatedly requested to contact his lawyer but that they had ignored the request.

The hearing judge found that appellant was not a credible witness and that he had knowingly and voluntarily waived his *Miranda* rights.

### *Trial*

Darrell Allen testified that at approximately 2:00 p.m. on December 4, 1998, he was leaning on Kevin Jackson's car talking to Kevin Jackson, who was inside the car. Allen stated that he stood up and saw a gun pointing at him so he started running. He heard at least eight gunshots.

Kevin Jackson, pursuant to a plea agreement, testified that he had plead guilty to armed robbery and use of a handgun in connection with the robbery and murder on November 29, 1998, of Ronald Muse, appellant's cousin. He also had plead guilty to possession of cocaine and transporting a handgun. Jackson elaborated and stated that on November 29, 1998, he, Jerome Wright, and Arthur Carroll had gone to appellant's house to rob him. Appellant was not at home, but Ronald Muse was present, and Arthur Carroll gun-whipped, shot, and killed Ronald Muse.

Jackson further testified that, on December 4, 1998, he was in his car when Darrell Allen came over to talk to him. He heard Allen yell and saw him run. Jackson attempted to drive away but his car would not accelerate, so he was "just in the middle of some fire." Jackson got out of the car and ran. He stated that he had not seen the assailant.

In his statement to police, appellant admitted that he wanted to speak to Jackson about his alleged involvement in the shooting of Ronald Muse, but that when he walked up to the car, he saw that Mr. Jackson had a gun, and he fired at Mr. Jackson at that time.

The State and appellant stipulated that Jerome Wright, if called to testify, would testify that he gave a statement to Detective Harding on February 4, 1999, wherein he stated that Arthur Carroll shot Ronald Muse. It was further stipulated that, subsequently, Mr. Wright testified under oath in a court hearing that Kevin Jackson was the person who shot Ronald Muse.

## Discussion

### 1.

Appellant first contends that the circuit court erred in denying his motion to suppress his statements to police based on (a) the lengthy duration of the custody and interrogation, (b) the failure to take appellant before a commissioner without unnecessary delay, and (c) the refusal of the officers to disclose the existence of the warrant and to honor appellant's right to counsel. Appellant concludes that, because of the above facts, the statements were involuntary under the federal and state constitutions as well as Maryland common law. Appellant does not rely on any legal authorities, however, except with respect to the duration of the custody.[2]

---

2. Appellant does not argue that his *Miranda* rights were violated because, in advising him of his rights, the police did not expressly acknowledge to him that they had been advised that he was already represented by counsel. In other words, appellant does not challenge

 In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing and do not consider the record of the trial. *See* Maryland Rule 4–252; *see Trusty v. State*, 308 Md. 658, 670, 521 A.2d 749 (1987) (citing *Jackson v. State*, 52 Md.App. 327, 332 n. 5, 449 A.2d 438, *cert. denied*, 294 Md. 652 (1982)); *Gamble v. State*, 318 Md. 120, 125, 567 A.2d 95 (1989); *Herod v. State*, 311 Md. 288, 290, 534 A.2d 362 (1987). In considering the evidence presented at the suppression hearing, "[w]e extend great deference to the fact finding of the suppression hearing judge with respect to determining the credibilities of contradicting witnesses and to weighing and determining first-level facts." *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356 (1990). When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that the findings are clearly erroneous. *See Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990). As to the ultimate conclusion, we must make our own constitutional appraisal by reviewing the law and applying it to the facts of the case. *Id.; Perkins*, 83 Md.App. at 346, 574 A.2d 356.

With regard to the precise issue now before us, the voluntariness of a confession, the Court of Appeals has explained:

> In reviewing the issue of whether a confession is voluntary under the Fourteenth Amendment, we accept the trial judge's factual findings as correct unless they are clearly erroneous, and from these findings, along with a review of the entire record, make an independent determination of "the ultimate fact, namely, the existence or nonexistence of voluntariness."

*Hoey v. State*, 311 Md. 473, 484, 536 A.2d 622 (1988) (citations omitted).

 Only where police conduct has overborne the defendant's will to resist and produces a statement that was not freely self-determined will a confession be suppressed. *Ball v.*

the content of the warnings or contend that a different warning should have been given because of the police officers' knowledge.

*State*, 347 Md. 156, 179, 699 A.2d 1170 (1997), *cert. denied*, 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998). A confession's voluntariness is measured by "the totality of the circumstances." *Reynolds v. State*, 327 Md. 494, 504, 610 A.2d 782 (1992), *cert. denied*, 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993) (citations omitted); *Hoey*, 311 Md. at 483, 536 A.2d 622. In *Hof v. State*, 337 Md. 581, 596–97, 655 A.2d 370 (1995), the Court of Appeals explained that the factors within the "totality of the circumstances" standard include:

> where the interrogation was conducted, its length, who was present, how it was conducted, its content, whether the defendant was given *Miranda* warnings, the mental and physical condition of the defendant, the age, background, experience, education, character, and intelligence of the defendant, when the defendant was taken before a court commissioner following arrest, and whether the defendant was physically mistreated, physically intimidated or psychologically pressured.

(citations omitted); *see also In re Eric F.*, 116 Md.App. 509, 517, 698 A.2d 1121 (1997).

### (a) Duration of the custody and interrogation

With respect to duration of the custody, appellant relies on *Young v. State*, 68 Md.App. 121, 510 A.2d 599 (1986). In *Young*, this Court held that, while the police technically apprised Young of his rights, the overall conduct of the police in interrogating him tended to negate the purpose of the *Miranda* safeguards and rendered Young's confessions involuntary. In particular, we noted that the police interrogated the defendant "almost continuously" for twenty-two and one-half hours by means of a relay team. *Id.* at 130, 510 A.2d 599. The officers also delayed Young's presentment to a judicial officer although one was available, and despite an order by the judicial officer to take Young to a county detention center, the police returned Young to interrogation for further questioning where he eventually confessed. *Id.* at 126–27, 510 A.2d 599. In light of those circumstances, this Court held that the lengthy custody and interrogation, coupled with the police

misconduct, rendered Young's confession involuntary. *Id.* at 135, 510 A.2d 599.

■ This case, however, is distinguishable from the facts presented in *Young.* Although appellant was in custody for thirty-five and one-half hours prior to giving a statement, appellant acknowledges that he was interrogated for only fourteen hours, with the longest period of uninterrupted questioning lasting only about an hour. Officers gave appellant food, drink, and cigars. Officers also acceded to each request appellant made to be left alone or use the bathroom. Appellant was never in any apparent discomfort. Additionally, we do not infer improper interrogation tactics from the fact that he confessed only after the detectives informed him that his friends implicated him in the murder. The tactics were not overbearing and did not induce appellant to speak at that time.

### (b) Failure to take appellant before a commissioner without unnecessary delay

In arguing that his confession was involuntary and the motion to suppress should have been granted by the circuit court, appellant also points to the delay in taking him before a commissioner. The Court of Appeals, in *Johnson v. State,* 282 Md. 314, 328–29, 384 A.2d 709 (1978), held that a statement, voluntary or otherwise, is subject to exclusion if obtained in violation of the Maryland presentment statute—presently Rule 4–212(e). Thereafter, the General Assembly abrogated the 'per se' exclusionary rule of *Johnson* by enacting Md. Code, Cts. & Jud. Proc. § 10–912. *See Young v. State,* 68 Md.App. 121, 510 A.2d 599 (1986) (noting that the General Assembly has directed Maryland courts not to continue application of the per se exclusionary rule). Section 10–912 of the Maryland Courts & Judicial Proceedings Article provides:

Failure to take defendant before judicial officer after arrest.

(a) Confession not rendered inadmissible.—A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest

within any time period specified by Title 4 of the Maryland Rules.

(b) Effect of failure to comply strictly with Title 4 of the Maryland Rules.—Failure to strictly comply with the provisions of Title 4 of the Maryland Rules pertaining to taking a defendant before a judicial officer after arrest is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession.

Thus, according to the statute, the delay in bringing the defendant before a judicial officer after an arrest is "only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession." Md.Code, Cts. & Jud. Proc. § 10–912 (1999).

### (c) Refusal of the officers to disclose the existence of the warrant and to honor appellant's right to counsel

Appellant also emphasizes the earlier contact by his attorney with the police officers and the refusal of the officers to both disclose the existence of the warrant and to honor appellant's right to counsel. Significantly, however, appellant did not request to speak with his attorney throughout the custodial interrogation.

■■ A suspect's waiver of his Fifth Amendment rights is valid only if it is made "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. The inquiry into the validity of a waiver has two distinct dimensions. *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421, 106 S.Ct. 1135. Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S.Ct. 1135.

Appellant does not explicitly challenge either prong of the waiver inquiry. Instead, he argues that the trial court should have suppressed his confession because of the conduct of the police. We disagree based on the Supreme Court's decision in *Moran,* 475 U.S. at 421–24, 106 S.Ct. 1135.

The *Moran* Court held that the voluntariness of a defendant's waiver of his Fifth Amendment right to remain silent and right to counsel was not vitiated by the failure of police to inform him that his attorney had telephoned for him at the police station during the course of police questioning. *Id.* The Court concluded that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422, 106 S.Ct. 1135. The Court further concluded that "the level of the police's culpability in failing to inform [a defendant] of [his attorney's] telephone call [does not have] any bearing on the validity of the waivers." *Id.* at 423, 106 S.Ct. 1135.

Appellant attempts to distinguish the instant case from *Moran* by alleging that, while the defendant in *Moran* at all relevant times was unaware of his sister's efforts to obtain an attorney to represent him and of the attorney's call to the police, in this case it was evident that he had retained a lawyer, had discussed the matter with the lawyer, and had decided to make no statement to the police if the attorney was not present. We find this distinction irrelevant to the validity of appellant's waiver. The Supreme Court's assessment of police culpability in *Moran* is applicable:

[W]hether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his Miranda rights unless he were at least aware of the incident. *Compare Escobedo v. Illinois,* 378 U.S. 478, 481, 84 S.Ct. 1758, 1760, 12 L.Ed.2d 977 (1964) (excluding confession where police incorrectly told the sus-

pect that his lawyer " 'didn't want to see' him"). Nor was the failure to inform respondent of the telephone call the kind of "trick[ery]" that can vitiate the validity of a waiver. *Miranda,* 384 U.S., at 476, 86 S.Ct., at 1629. Granting that the "deliberate or reckless" withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. Because respondent's voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey, the waivers were valid.

*Moran,* 475 U.S. at 423–24, 106 S.Ct. 1135.

■■■ Appellant asserts that the police should have informed his attorney, Mr. Kupferberg, of the outstanding warrant against appellant when he contacted them on December 14. This assertion does not affect the voluntariness of appellant's waiver of his *Miranda* rights. *Moran* is again instructive. In *Moran,* the Court accepted, *arguendo,* the fact that the police may have engaged in highly reprehensible conduct in keeping an attorney from contacting his client, Burbine. The Court eschewed any per se exclusion based on the police conduct itself and in emphasizing the highly subjective nature of the voluntariness decision. The Court's opinion stressed the fact that in dealing with the privilege against compelled self-incrimination, the only pertinent criterion is the impact that official activity may have on a defendant's subjective state of mind:

At the outset, while we share respondent's distaste for the deliberate misleading of an officer of the court, reading *Miranda* to forbid police deception of an attorney "would cut [the decision] completely loose from its own explicitly stated rationale." *Beckwith v. United States,* 425 U.S. 341, 345 [96 S.Ct. 1612, 48 L.Ed.2d 1] (1976). As is now well established, "[t]he ... Miranda warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the [suspect's] right against compul-

sory self-incrimination [is] protected." *New York v. Quarles,* 467 U.S. 649, 654 [104 S.Ct. 2626, 81 L.Ed.2d 550] (1984), *quoting Michigan v. Tucker,* 417 U.S. 433, 444 [94 S.Ct. 2357, 41 L.Ed.2d 182] (1974). Their objective is not to mold police conduct for its own sake. Nothing in the Constitution vests in us the authority to mandate a code of behavior for state officials wholly unconnected to any federal right or privilege. The purpose of the *Miranda* warnings instead is to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights. Clearly, a rule that focuses on how the police treat an attorney—conduct that has no relevance at all to the degree of compulsion experienced by the defendant during interrogation—would ignore both *Miranda*'s mission and its only source of legitimacy. 475 U.S. at 424–25, 106 S.Ct. 1135.

Appellant also asserts that his Fifth Amendment right to counsel was invoked when his attorney, Mr. Kupferberg, contacted police and indicated that appellant would not talk to police without his attorney being present. This argument also runs contrary to the Court's holding in *Moran.* *Moran* stresses that the privilege against compulsory self-incrimination is "a personal one that can only be invoked by the individual whose testimony is being compelled." *Id.* at 1147 n. 4. In *Moran,* the Court held that the respondent validly waived his *Miranda* rights even though he was unaware that counsel who had been obtained on his behalf sought to speak with him but had been turned away by the police. *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. 1135. "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422, 106 S.Ct. 1135. In a footnote, the Supreme Court rejected "a novel 'agency' theory of the Fifth Amendment under which any perceived deception of a lawyer is automatically treated as deception of his or her client. This argument entirely disregards the elemental and established proposition that the privilege against compulsory self-incrimination

is, by hypothesis, a personal one that can only be invoked by the individual whose testimony is being compelled."

*Id.* at 433, fn. 4, 106 S.Ct. 1135.

Both the holding and dicta in *Moran* preclude appellant's attorney, on the facts of this case, from unilaterally invoking his client's Fifth Amendment rights. The right is a personal one which must be invoked by the individual whose testimony is being compelled, and there is no agency theory applicable to these facts under which appellant's attorney could invoke that personal right on his behalf.

Other jurisdictions have specifically concluded that pursuant to *Moran,* the failure of police to follow defense counsel's instructions does not affect the validity of an otherwise valid waiver. *See Bryant v. State,* 314 Ark. 130, 862 S.W.2d 215, 221–22 (1993); *Commonwealth v. Cryer,* 426 Mass. 562, 689 N.E.2d 808, 812 (1998); *State v. Peterson,* 344 N.C. 172, 472 S.E.2d 730, 733 (1996); *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 197 (1997), *cert. denied,* 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). In *Bryant v. State,* 314 Ark. 130, 862 S.W.2d 215, 217 (1993), the trial court had denied defendant's motions to suppress incriminating statements he had made to the police. There, the defendant was wanted for questioning in a murder in Arkansas, was apprehended in Kentucky, and gave a statement to the Kentucky State Police. *Id.* at 218. Meanwhile, the Arkansas public defender had learned that the police were looking for appellant and requested that the circuit judge appoint him as appellant's attorney. *Id.* The circuit judge responded that he would do so in the event of appellant's apprehension. *Id.* The day after appellant's statement to Kentucky police, the public defender called the jail in Arkansas and left a message that appellant was not to make a statement about the crime, and subsequently called the Kentucky jail and requested that the jailer instruct appellant not to give a statement. *Id.* Thereafter, appellant called the attorney, and the attorney instructed him not to make a statement. *Id.* Appellant was extradited to Arkansas and gave a lengthy and incriminating recorded interview to Arkansas officials. *Id.* at 219. On appeal from the rulings on the

motion to suppress the statements, appellant argued, *inter alia*, that his Sixth Amendment rights were violated when police failed to follow his lawyer's instructions not to question him. *Id.* at 221. The Supreme Court of Arkansas noted that the attorney had not yet been appointed to represent appellant at the time the attorney gave the instruction to the jailers; appellant had already made the statement to the detective in Kentucky the day before the attorney called; and although the attorney instructed appellant not to make any statements, appellant subsequently chose to ignore counsel's advice and gave additional statements. *Id.* at 221–22. The court affirmed the denial of the motion to suppress the statements and stated that it would do so even if the attorney were representing appellant at the time and even if the police failed to follow the attorney's instructions. *Id.* at 222. In so ruling, the court stated that "[t]he failure of police to follow counsel's instructions does not affect the validity of an otherwise valid waiver." *Id.* at 222 (citations omitted).

Similarly, in *Commonwealth v. Cryer*, 426 Mass. 562, 689 N.E.2d 808 (1998), the Supreme Judicial Court of Massachusetts found that the failure of New Hampshire police to inform Massachusetts police officers, interrogating appellant in a New Hampshire jail, that appellant's attorney called instructing that there be no police interrogation of defendant unless an attorney was present, did not violate appellant's Fifth Amendment rights. While the Massachusetts officers were questioning appellant's co-defendant, the attorney appointed to represent appellant on an unrelated burglary charge called the New Hampshire police and jail, and instructed them not to question appellant without the attorney's permission. *Id.* at 811. The New Hampshire police did not, however, relay the attorney's instructions to appellant or Massachusetts police. Thereafter, Massachusetts police began questioning appellant, at which time he made a full confession. *Id.* On appeal, appellant argued that his confession was not voluntary because his waiver of his *Miranda* rights was not valid. *Id.* at 812. Relying on the Supreme Court holding in *Moran*, the Supreme Judicial Court of Massachusetts held that "under the

Fifth Amendment, the New Hampshire police had no obligation to inform either the Massachusetts officers or the defendant of the attorney's instructions ... [and] the Massachusetts officers had no such obligation to the defendant, even if they had known or should have known about the attorney's instructions." *Id.* at 812.

In *State v. Peterson*, 344 N.C. 172, 472 S.E.2d 730, 733 (1996), a defendant contended that his Fifth Amendment right to counsel was invoked when his attorney requested that he be present during any interrogation of the defendant. There, the attorney testified that he had advised the defendant not to speak to anyone unless he was present and that he had informed the jailer not to let the defendant be interviewed by anyone without informing the attorney prior to the interview. *Id.* at 733. Police testified that before interviewing defendant, they apprised defendant of his rights, and defendant did not request an attorney until after he made an inculpatory statement. The Supreme Court of North Carolina held that a defendant's right to counsel is personal to him, and a defendant may waive this right despite his attorney's advice to the contrary and his attorney's instructions to investigating officers not to talk to him. *Id.* at 733–34.

In *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 197 (1997), appellant sought to suppress his statement concerning his involvement in a murder. There, while being interviewed by police, the attorney representing appellant in a separate federal criminal matter called police. *Id.* The police represented to the attorney that they were not questioning appellant, and would not allow the attorney to speak with appellant. *Id.* at 198. The attorney was not retained at the time of the call, nor was he subsequently retained. *Id.* The appellant never requested an attorney during the questioning. *Id.* In affirming the trial court's decision not to suppress the statement, the Supreme Court of North Carolina noted that "[s]ince one's Sixth Amendment and Fifth Amendment rights are personal, they cannot be invoked by another party." *Id.* at 285 (citation omitted). The court also observed that "a person accused of a crime who has already engaged counsel

may, with full knowledge of his rights but in the absence of counsel, effectively waive his right to have counsel present while he is questioned by the police." *Id.* at 197 (citation omitted). Accordingly, the court held that appellant was not improperly induced into waiving his rights, appellant knowingly, intelligently, and voluntarily waived his right to have counsel present, and the trial court correctly denied appellant's motion to suppress the statement he gave to the detective. *Id.* at 198.

We agree that a defendant's right to counsel is personal to him and he may waive this right although his attorney has instructed the investigating officers not to talk to him. In this case, despite Mr. Kupferberg's advice to the officers that appellant would not make a statement without his attorney being present, appellant's statement was admissible in light of the court's findings that supported the conclusion that appellant voluntarily, knowingly, and intelligently waived his rights. Appellant could waive his rights in spite of his attorney's advice to the contrary.

Even if appellant's arguments discussed above had merit, we would hold that appellant did not validly invoke his Fifth Amendment right to counsel because the invocation by counsel occurred outside of the context of custodial interrogation. *Miranda*'s safeguards were intended to provide protection against the inherent coerciveness of custodial interrogation. The "inherent compulsion" that is brought about by the combination of custody and interrogation is crucial for the attachment of *Miranda* rights. *See Miranda*, 384 U.S. at 478, 86 S.Ct. 1602. As the Supreme Court articulated in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), "[i]t is clear . . . that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."

In *McNeil v. Wisconsin*, 501 U.S. at 183 n. 3, 111 S.Ct. 2204, the Supreme Court implicitly rejected the notion that a suspect could assert *Miranda* rights outside the context of custo-

dial interrogation. There, the United States Supreme Court held that the petitioner's invocation of his Sixth Amendment right to counsel at the initial hearing to set bail did not operate to also invoke his Fifth Amendment right to counsel. *Id.* at 173, 111 S.Ct. 2204. The Court declined to adopt such a rule as a matter of public policy because the result would be that

> most persons in pretrial custody for serious offenses would be unapproachable by police officers suspecting them of involvement in other crimes, even though they have never expressed any unwillingness to be questioned. Since the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good, society would be the loser. Admissions of guilt resulting from valid *Miranda* waivers 'are more than merely "desirable"; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.'

*Id.* at 181, 111 S.Ct. 2204 (quoting *Moran v. Burbine,* 475 U.S. at 426, 106 S.Ct. 1135).

In his dissent in *McNeil,* Justice Stevens criticized the majority for maintaining a distinction between the right to counsel under the Fifth and Sixth Amendments. *See McNeil,* 501 U.S. at 184, 111 S.Ct. 2204 (Stevens, J., dissenting). Justice Stevens predicted that a competent attorney could avoid the consequences of the majority holding by having clients in future preliminary hearings make a statement on the record invoking the right to counsel under both the Fifth and the Sixth Amendments. *Id.* In a footnote, the majority rejected the dissent's notion stating:

> *We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than "custodial interrogation"*—which a preliminary hearing will not always, or even usually, involve. If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect

against. *The fact that we have allowed the Miranda right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.*

*McNeil*, 501 U.S. at 182 n. 3, 111 S.Ct. 2204 (citations omitted and emphasis added). Although this statement constitutes dictum, at least five federal courts of appeal subsequently have interpreted it to mean that an individual may not invoke the *Miranda* right to counsel before custodial interrogation has begun or is imminent. *See United States v. Grimes*, 142 F.3d 1342, 1347–48 (11th Cir.1998); *United States v. Thompson*, 35 F.3d 100 (2d Cir.1994); *Alston v. Redman*, 34 F.3d 1237 (3rd Cir.1994), *cert. denied*, 513 U.S. 1160, 115 S.Ct. 1122, 130 L.Ed.2d 1085 (1995); *United States v. LaGrone*, 43 F.3d 332 (7th Cir.1994); *United States v. Wright*, 962 F.2d 953 (9th Cir.1992).

In *United States v. Grimes*, 142 F.3d 1342 (11th Cir.1998), the court held that the claim of rights form signed by defendant, attempting to assert his right to counsel and right to remain silent under the Fifth and Sixth Amendments, was ineffective to invoke his *Miranda* right to counsel because these rights could only be invoked when interrogation is imminent or during custodial interrogation. *Id.* at 1347–48.

Similarly, the Seventh Circuit Court of Appeals held in *United States v. LaGrone*, 43 F.3d 332, 338–39 (7th Cir.1994), that "in order for a defendant to invoke his *Miranda* rights the authorities must be conducting interrogation, or interrogation must be imminent." *Id.* at 339. There, the court found that an accused asking to call an attorney for advice on how to respond to a request for consent to search his business did not invoke any right to counsel on the ground that a request for consent to search is not an interrogation. *Id.*

In *United States v. Thompson*, 35 F.3d 100 (2d Cir.1994), the court held that an attorney who filed a form "Notice of Entry of Appearance as Attorney or Representative" with the

Immigration and Naturalization Service did not effectively invoke his client's right not to respond to custodial interrogation in the absence of counsel.

In *United States v. Wright,* 962 F.2d 953, 955 (9th Cir.1992), the court held that defense counsel's request at a plea hearing to be present at subsequent interviews of the defendant was insufficient to invoke the *Miranda* right to counsel for custodial interrogation concerning a separate investigation. There, Wright was arrested and pled guilty to armed robbery. At the plea hearing, his attorney stated that she wanted to be present at any interviews with her client. *See id.* at 954. Thereafter, Wright, without counsel being present, was interrogated regarding an unrelated bank robbery and confessed. At trial, Wright moved to suppress the confession on the basis that his attorney's statement at the hearing precluded further police-initiated questioning without the presence of counsel. *See id.* On appeal, the Ninth Circuit Court of Appeals rejected the arguments.

In *Alston v. Redman,* 34 F.3d 1237, 1247 (3rd Cir.1994), the court articulated the following rationale:

> To require that the Government first act to compel an individual to incriminate herself before that individual can assert her right to remain silent is merely to recognize that the privilege against self-incrimination acts as a shield against state action rather than as a sword, and that the shield may only be interposed when state action actually threatens.

There, the defendant had been arrested for a series of robberies. He confessed to those and six other robberies after validly waiving his *Miranda* rights. Thereafter, he was sent to prison for pretrial detention. A few days later, he was interviewed by someone from the public defender's office, during which time the defendant signed a form letter which stated that he would not speak to police without the presence of counsel. When brought to the police station for processing on the six new robberies, the defendant was again read his *Miranda* rights for further questioning. The defendant

waived his rights, and it was during this interrogation that the defendant confessed to yet another robbery. *Alston,* 34 F.3d at 1240–41. The defendant attempted to exclude this second confession on the ground that the executed form letter was sufficient to invoke his *Miranda* right to counsel and prevent further police-initiated questioning. The Third Circuit Court of Appeals disagreed, concluding that the *Miranda* right to counsel cannot be invoked outside the context of custodial interrogation. The court stated:

> The antipathy expressed in *McNeil* towards the anticipatory invocation of the *Miranda* rights is consistent with *Miranda*'s underlying principles. The *Miranda* right to counsel is a prophylactic rule that does not operate independent from the danger it seeks to protect against—"the compelling atmosphere inherent in the process of in-custody interrogation"—and the effect that danger can have on a suspect's privilege to avoid compelled self-incrimination.

*Alston,* 34 F.3d at 1246 (quoting *Miranda,* 384 U.S. at 478, 86 S.Ct. 1602).

Additionally, several of our state counterparts have rejected the notion that the Fifth Amendment right to counsel can be invoked before the suspect is in custody. *See People v. Avila,* 75 Cal.App.4th 416, 89 Cal.Rptr.2d 320 (1999); *Sapp v. State* 690 So.2d 581, 583–85 (Fla.1997); *State v. Warness,* 77 Wash. App. 636, 893 P.2d 665 (1995); *State v. Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456 (1995)(holding that the defendant's attempt to invoke *Miranda* rights before being taken into custody was an "empty gesture"); *Commonwealth v. Morgan* 416 Pa.Super. 145, 610 A.2d 1013 (1992), *appeal denied,* 533 Pa. 618, 619 A.2d 700 (1993)(holding that even though "the police officer took the precautionary step of reading Miranda rights to a non-custodial suspect," the defendant could not assert the Fifth Amendment right to counsel outside the context of custodial interrogation).

 Allowing an anticipatory invocation of the *Miranda* right to counsel on these facts would extend an accused's privilege against compelled self-incrimination beyond the in-

tent of *Miranda* and its progeny. The purported invocation by appellant's attorney was implicitly rejected by the Supreme Court in *McNeil.* Appellant claims his attorney asserted rights against actions he anticipated the State to take, but which had not yet occurred. Nevertheless, when the interrogation actually occurred, appellant voluntarily waived his rights and expressed no objection to being questioned by police. Because appellant's purported invocation, through his attorney, occurred before appellant was in custody, it could not operate to invoke his Fifth Amendment right to counsel. On these facts, we need not decide whether, in addition to custody, interrogation must be actual or at least imminent before the right to counsel can be invoked.

 At the suppression hearing, the hearing court found that appellant understood his rights and voluntarily waived them. Appellant testified that the police ignored his request to see his attorney and continued questioning him. The testimony of several police officers, however, contradicted appellant's assertions. They testified that appellant never asked them to cease the interrogation or indicate that he wished to consult an attorney. The police also testified that appellant indicated that he understood his rights, and that he waived them in writing. As previously discussed, the credibility of witnesses who testify at a suppression hearing concerning the circumstances surrounding the defendant's in-custodial statement is for the hearing judge to determine. Furthermore, it was appellant's right to assert. Appellant had full knowledge of his rights and had been specifically coached by his attorney on how to invoke them. Instead he chose not to. This was an "intelligent" and "knowing" waiver of his right to an attorney. Accordingly, we affirm the trial court's decision allowing the State to introduce appellant's confession into evidence.

## 2.

Appellant contends that the circuit court erred in denying his motion for a mistrial and in refusing to reopen the suppression hearing. At trial, Darrell Allen testified that he

had witnessed the shooting but was unable to identify the shooter because his head was obscured by a "grey hoody." Mr. Allen stated that, although in his statement to the police he indicated that he recognized appellant as the shooter, in fact he had told the police that the shooter could be appellant but that he did not know for sure because he had not seen his face.

At the close of Mr. Allen's testimony, appellant's counsel moved for a mistrial on the ground that the sole basis for the arrest warrant was Mr. Allen's alleged identification, and that in light of the trial testimony, the motion to suppress should be reopened because if Allen were believed, there was no probable cause for the arrest. The circuit court denied the motion and did not reopen the suppression hearing.

After the testimony of State's witness Willie Fogg, appellant's counsel renewed his motion for mistrial on the ground that Mr. Allen had testified that he did not identify appellant as the shooter in his statement to the police. The court denied the motion and indicated that it would wait until all the evidence unfolded before making a final ruling. Appellant's counsel agreed but did not subsequently renew his motion for mistrial. Under the circumstances, it is highly questionable as to whether the claim has been preserved.

 Assuming that the claim was preserved, we find no abuse of discretion on the part of the circuit court. The decision to reopen a suppression hearing falls within the discretion of the trial judge. *See* Md. Rule 4–252(h)(2)(B); *see also Long v. State,* 343 Md. 662, 672–73, 684 A.2d 445 (1996); *Johnson v. State,* 67 Md.App. 347, 376, 507 A.2d 1134, *cert. denied,* 307 Md. 260, 513 A.2d 314, *cert. denied,* 479 U.S. 993, 107 S.Ct. 594, 93 L.Ed.2d 595 (1986). Similarly, the decision to declare a mistrial rests within the sound discretion of the trial judge. *Hill v. State,* 355 Md. 206, 221, 734 A.2d 199 (1999) (citations omitted); *Parker v. State,* 129 Md.App. 360, 387, 742 A.2d 28 (1999); *Ayers v. State,* 335 Md. 602, 615 n. 2, 645 A.2d 22 (1994), *cert. denied,* 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995). In this case, the trial court observed

that there had been no testimony from the police officers when appellant moved for a mistrial. The witness confirmed that he had signed each page of the statement in which he identified appellant as the shooter, did not claim that his statement was coerced, and responded negatively when questioned whether the police indicated who he should identify. We see no abuse of discretion in denying appellant's motion for mistrial, particularly in light of the failure to ask the court to revisit the issue based on the evidence received subsequent to denial of the motion.

### 3.

Appellant contends that the circuit court erred in refusing to give two instructions relating to self defense. The first instruction was as follows:

A defendant has a right to arm himself if he was not seeking a fight, but was apprehensive that he would be attacked. The defendant does not forfeit his right to self-defense by arming himself in advance, provided he did not seek the encounter and had reason to fear an unlawful attack on his life.

The second instruction was as follows:

In determining whether the defendant's conduct was reasonable under the circumstances, you should judge his conduct by the facts as you believe they appeared to him.

A belief which may be unreasonable to a calm mind may be actually and reasonably held under the circumstances as they appeared to the defendant at the time of the incident.

With regard to jury instructions, Maryland Rule 4–325(c) provides:

(c) How Given.—The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

A trial court must properly instruct the jury on a point of law that is supported by "some" evidence in the record. *See Dykes v. State,* 319 Md. 206, 220, 571 A.2d 1251 (1990); *Wiegmann v. State,* 118 Md.App. 317, 349, 702 A.2d 928 (1997), *aff'd,* 350 Md. 585, 714 A.2d 841 (1998). Indeed, " 'it is incumbent upon the court, ... when requested in a criminal case, to give an instruction on every essential question or point of law supported by the evidence.' " *Robertson v. State,* 112 Md.App. 366, 374, 685 A.2d 805 (1996) (quoting *Bruce v. State,* 218 Md. 87, 97, 145 A.2d 428 (1958)); *see also Gunning v. State,* 347 Md. 332, 347, 701 A.2d 374 (1997); *Smith v. State,* 302 Md. 175, 179, 486 A.2d 196 (1985); *Pulley v. State,* 38 Md.App. 682, 686, 382 A.2d 621 (1978); *Couser v. State,* 36 Md.App. 485, 499, 374 A.2d 399 (1977), *aff'd,* 282 Md. 125, 383 A.2d 389, *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978).

 On the other hand, a trial court is not required to give a specific instruction unless: (1) it constitutes an accurate statement of the law; (2) it is applicable to the facts and circumstances of the case; and (3) it is not otherwise fairly covered by the other instructions. *See Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984); *see also Ellison v. State,* 104 Md.App. 655, 660, 657 A.2d 402, *cert. denied,* 340 Md. 216, 665 A.2d 1058 (1995).

### (a) Arming in advance of an attack

 With respect to the first instruction, appellant relies primarily on *Gunther v. State,* 228 Md. 404, 179 A.2d 880 (1962), *Bennett v. State,* 230 Md. 562, 188 A.2d 142 (1963), and *Rajnic v. State,* 106 Md.App. 286, 664 A.2d 432 (1995).

In *Gunther,* the defendant shot and killed his brother-in-law with a rifle he had placed on the backseat of his car. 228 Md. at 406–07, 179 A.2d 880. The victim had severely beaten his wife, Gunther's sister, the night before, and she had asked Gunther to assist her in moving. *Id.* Gunther knew of prior violent acts by the husband and believed the husband always carried a gun. *Id.* at 407, 179 A.2d 880. Based on these

circumstances, the Court of Appeals found that the trial court should have instructed the jury "that if believed that the defendant was not seeking a fight with his brother-in-law, but on the contrary was apprehensive that he might be attacked by him, then the defendant, under the circumstances, would have a right to arm himself in anticipation of the assault." *Id.* at 409, 179 A.2d 880.

In *Bennett,* the defendant shot and killed her abusive husband. 230 Md. at 565, 188 A.2d 142. In response to her husband's threats to kill her, Bennett left a loaded shotgun in the kitchen. *Id.* After an argument, her husband entered the kitchen carrying a large hunting knife, and Bennett shot and killed him. *Id.* The Court of Appeals held that "where the circumstances are such as could induce a jury to believe that the defendant was not the aggressor, but was instead apprehensive that [s]he might be attacked by the victim," the trial court should have instructed the jury regarding Bennett's right to arm herself. *Id.* at 567, 188 A.2d 142.

In *Rajnic,* the defendant went into his bedroom during a party, and placed a handgun kept by his girlfriend onto a dresser. 106 Md.App. at 291, 664 A.2d 432. When four men at the party threatened to attack him for allegedly striking his girlfriend, Rajnic returned to his bedroom and closed the door. Three of the men eventually charged into the bedroom. During the melee that followed, three men were shot and killed. *Id.* at 492. This Court concluded in *Rajnic* that, according to *Gunther,* the trial court should have instructed the jury "that one who is not the aggressor but has reason to fear an attack upon his life does not forfeit his right to self-defense by arming himself in advance of the attack." *Id.* at 295, 664 A.2d 432. We disapproved, however, of the use of language declaring a defendant's "right to arm himself in anticipation of an assault." *Id.* at 295–96, 664 A.2d 432. This Court explained:

Although, in construing *Gunther,* the Court of Appeals in both *Bennett* and *Crawford* spoke of a right to arm in advance of an attack, we believe that the Court was merely using the term as "short-hand" and did not mean to suggest that such a broad right literally exists. As we explained in

*Medley v. State,* 52 Md.App. 225, 234–35, 448 A.2d 363, *cert. denied,* 294 Md. 544 (1982),

> Gunther must be read as recognizing no more than the principle expressed in the authorities cited in it—that one does not necessarily forfeit his privilege of self-defense because he has previously armed himself in anticipation of an attack. It does not support the existence of any such right to arm, either as a general affirmative right or as a defense to the violation of a statutory prohibition against possessing or carrying weapons in public.

(Emphasis omitted). Thus, appellant's first requested instruction—that under certain circumstances a defendant has a "right to arm himself in anticipation of an assault"—was technically incorrect and the trial court properly declined to give it.

106 Md.App. 286, 295, 664 A.2d 432. Thus, under *Rajnic,* the trial court in this case properly declined to give an instruction implying a defendant's "right to arm himself."

Additionally, the trial court properly declined to give the requested instruction because the evidence failed to generate an issue regarding appellant arming himself in advance. Appellant points to evidence that there were rumors that Kevin Jackson had something to do with Ronald Muse's death and that he went to talk to him but Jackson raised his gun. Appellant's own version of the events indicated that he sought the encounter. In *Gunther,* the right to arm oneself was qualified by the proviso that such person should be "one who is not in any sense seeking an encounter." *Gunther v. State,* 228 Md. 404, 409, 179 A.2d 880 (1962); *see also Bennett v. State,* 230 Md. 562, 567, 188 A.2d 142 (1963); *Crawford v. State,* 231 Md. 354, 361, 190 A.2d 538 (1963). Unlike the facts in the cases relied on by appellant, in this case, it is uncontradicted that appellant willingly sought out the victim and armed himself in anticipation of the encounter. Accordingly, the requested instruction was properly refused because it was not supported by the evidence.

## (b) Reasonableness of appellant's beliefs

■ Appellant also contends that the trial court erred by not instructing the jury that reasonableness of appellant's beliefs should be assessed from his perspective at the time of the incident. In doing so, appellant again relies on *Rajnic*. In *Rajnic*, the court instructed the jury that in order to find that appellant acted in self-defense, it must find that he "actually believed he was in immediate and imminent danger of death or serious bodily harm" and that this belief was "reasonable." *Rajnic*, 106 Md.App. at 296, 664 A.2d 432. There, we found reversible error because the language "did not include the thought that the defendant's belief had to be reasonable in view of the circumstances as they appeared to the defendant at the time." *Id.* at 297, 664 A.2d 432.

Unlike the circumstances in *Rajnic*, however, the trial court in this case instructed the jury that the defendant's belief had to be reasonable. While *Rajnic* required that the concept of reasonableness be conveyed, we decline to find that it required that the specific instruction, as requested by this appellant, had to be given.

In this case, the jury instructions were taken almost verbatim from section 4:17.14 of the Maryland Criminal Pattern Jury Instructions. *See* Maryland State Bar Ass'n, *Maryland Criminal Pattern Jury Instructions* 4:17.14, at 277.2–.8 (1986, 1995 Supp.). While we have acknowledged that the pattern jury instructions are not always adequate for every conceivable situation, as a general matter we have favored the use of the Maryland Pattern Jury Instructions. *See Green v. State,* 119 Md.App. 547, 561–62, 705 A.2d 133 (1998); *Bayne v. State,* 98 Md.App. 149, 160, 632 A.2d 476 (1993) ("We note that generally the pattern jury instructions suffice and trial judges usually may rely on them.") As we recently stated:

> [W]e say for the benefit of trial judges generally that the wise course of action is to give instructions in the form, where applicable, of our Maryland Pattern Jury Instructions. Those instructions have been put together by a group of distinguished judges and lawyers who almost

amount to a "Who's Who" of the Maryland Bench and Bar. Many of these instructions have been passed upon by our appellate courts.

*Green v. State,* 127 Md.App. 758, 771, 736 A.2d 450 (1999). These instructions repeatedly refer to the defendant's belief and make clear that the circumstances must be considered from the defendant's perspective.

Specifically, in terms of self-defense, the court instructed the jury in this case that for self-defense to be a complete defense, the following factors apply:

Number one, that the Defendant was not the aggressor;

Number two, that the Defendant actually believed that he was in immediate and imminent danger of death or serious bodily harm; that the Defendant actually believed he was in immediate and imminent danger of death or serious bodily harm;

Number three, that the Defendant's belief was reasonable; and

Number four, that the Defendant used no more force than was reasonably necessary to defend himself in light of the threatened or actual force.

I will repeat that. That the Defendant used no more force than was reasonably necessary to defend himself in light of the threatened or actual force.

And if you believe it applicable in this particular case, that the Defendant had a duty to retreat and did not do so.

Along those lines, if you find this to be applicable, before using deadly force, the Defendant is required to make all reasonable effort to retreat. The Defendant does not have to retreat if the Defendant was in his home, or retreat was unsafe, or the avenue to retreat was unknown to the Defendant.

If you find that the Defendant did not use deadly force, then the Defendant had no duty to retreat.

Now, regarding those factors I just read to you, and these are the factors that must exist for complete self-defense to

apply, in order to convict the Defendant of attempted murder, first or second degree, the State must prove that self-defense does not apply. Therefore, this means you are required to find the Defendant not guilty unless the State has persuaded you beyond a reasonable doubt that at least one of those factors I've just read to you was absent.

Everybody understand that? Those factors I just read to you, the State's got the burden of proof to prove beyond a reasonable doubt that at least one of those factors was not present. The Defendant doesn't have the burden. The State does. And their burden is beyond that reasonable doubt standard I defined earlier.

Even if you find the Defendant did not act in complete self-defense—which, remember, I told you is a defense to everything right down the line on your verdict sheet—that doesn't mean to say that you can't still consider partial or imperfect self-defense.

In other words, the Defendant still could have acted in partial or imperfect self-defense. That means to say *if the Defendant actually believed that he was in immediate or imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, the Defendant's actual, although unreasonable, belief is a partial self-defense, and the verdict should be guilty of attempted voluntary manslaughter rather than attempted first or second degree murder.*

*Let me repeat that to you.*

*If the Defendant actually believed that he was in immediate or imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, the Defendant's actual, though unreasonable, belief is a partial self-defense, and the verdict should be guilty of attempted voluntary manslaughter rather than attempted murder.* That's why we call it partial or imperfect self-defense. That's why I use that language in Question 3.

*If the Defendant used greater force than a reasonable person would have used, but the Defendant actually be-*

*lieved that the force used was necessary, the Defendant's actual, though unreasonable, belief is, again, a partial self-defense, and the verdict should be guilty of attempted voluntary manslaughter rather than attempted murder.*

*Once again, if the Defendant used greater force than a reasonable person would have used, but the Defendant actually believed that the force used was necessary, the Defendant's actual, though unreasonable, belief is a partial self-defense, and the verdict should be guilty of attempted voluntary manslaughter rather than attempted murder.*

In summary, in order to convict the Defendant of attempted murder, the State must prove that the Defendant did not act in complete self-defense or partial self-defense. This would mean this instruction I just read to you relates to first and second degree attempted murder.

If the Defendant did act in complete self-defense, your verdict must be not guilty right down the line.

If the Defendant did not act in complete self-defense, but did act in partial or imperfect self-defense, as I phrased it in the verdict sheet, your verdict must be guilty of attempted voluntary manslaughter and not guilty of attempted murder.

(Emphasis added).

The court's instructions to the jury made clear that appellant's belief had to be reasonable, and we are convinced that the instructions also made clear that the circumstances had to be considered from the defendant's perspective. Accordingly, we find no error.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**